## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE AMERICAN SOCIETY FOR THE
PREVENTION OF CRUELTY TO
ANIMALS,
424 E. 92nd St.
New York, NY 10128-6804,

        Plaintiff,

    v.

ANIMAL AND PLANT HEALTH
INSPECTION SERVICE
4700 River Rd.
Riverdale, MD 20737;

UNITED STATES DEPARTMENT OF
AGRICULTURE
1400 Independence Ave., SW
Washington, D.C. 20250;

THOMAS J. VILSACK, in his official capacity as
Secretary of the U.S. Department of Agriculture
1400 Independence Ave., SW
Washington, D.C. 20250,

        Defendants.

Case No. 21-cv-1600

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

## **INTRODUCTION**

1.    Although the Animal Welfare Act ("AWA") establishes strict requirements for the

thousands of dog dealers licensed by Defendant United States Department of Agriculture

("USDA"), USDA has allowed these dealers to flout the AWA's requirements with impunity.

Specifically, despite evidence suggesting that there are over 1,000 violations[1] of the AWA and its

implementing regulations by dog dealers each year, USDA has stopped recording certain

---

[1] This estimate comes from public data provided by Defendant USDA from 2014–2016. Since
then, Defendant USDA has made it significantly harder to ascertain such data.

violations and has refused to impose penalties for violations that are recorded. Instead, USDA has adopted a "Customer Support" approach that treats unlawful actors as "customers." As a result of this approach, USDA has imposed no statutory penalties against a licensed dog dealer since 2017.

2.      This state of affairs has a simple explanation: the Animal Care unit of Defendant Animal and Plant Health Inspection Service ("APHIS"), the branch of Defendant USDA that administers the AWA,[2] has determined—in violation of the Administrative Procedure Act ("APA")—that compliance with the AWA is achieved most effectively through "education and cooperation" efforts as opposed to enforcement of the AWA.

3.      Defendants' unlawful "Customer Service Policy" is embodied in Defendant USDA's Animal Welfare Inspection Guide ("Guide")[3] and in three official statements explaining Defendant USDA's strategy for administering the AWA ("Policy Statements").

4.      The Guide requires Defendant APHIS's inspectors to follow three concrete rules. The "Teachable Moments Rule" and the "Veterinary Care Rule" direct inspectors to ignore certain AWA violations. The "Courtesy Visits Rule" allows licensed dealers to request visits from inspectors and provides that, during these visits, inspectors must ignore *all* AWA violations that the inspectors see.

5.      In turn, the Policy Statements explain that the Customer Service Policy is motivated by Defendant USDA's belief that education initiatives are an appropriate substitute for enforcement actions. The Policy Statements express the unfounded and arbitrary position that treating dealers as "customers" and providing dealers with "customer support" is an appropriate

---

[2] *Animal Welfare Act*, Animal and Plant Health Inspection Service, U.S. Department of Agriculture (Jul. 23, 2020), https://bit.ly/3b7Rt9M.

[3] *Animal Welfare Inspection Guide*, Animal and Plant Health Inspection Service, U.S. Department of Agriculture (Jan. 2021), https://bit.ly/3hc1Xc1.

way to secure compliance with the AWA.  One of the Policy Statements goes so far as to say that Defendant USDA's "goal is to be the most effective and most customer-focused department in the Federal government."[4]

6.      The Customer Service Policy, as embodied in the Guide and the Policy Statements, directly conflicts with the AWA, which establishes a comprehensive scheme for Defendant USDA to investigate potential AWA violations, to assess penalties, and to adjudicate the fairness of those penalties.  *See* 7 U.S.C. §§ 2143, 2146, 2149.  The text and structure of the AWA make clear that Congress intended for Defendant USDA to use this scheme to secure compliance with the AWA's substantive requirements.  By contrast, the AWA does not authorize USDA to expend resources on education initiatives or other programs aimed at providing "customer support" as substitutes for enforcement pursuant to the express statutory scheme.  In short, Defendants' decision to forgo enforcement and focus on education is contrary to the AWA.

7.      Notably, the unlawful Customer Service Policy also disregards findings made years earlier by Defendant USDA's Office of the Inspector General ("OIG"), which rebuked a less formal version of the Customer Service Policy.  In 2010, OIG released a report evaluating Defendant APHIS's system for inspecting "Problematic Dealers."[5]  OIG stated that Defendant APHIS's system was based on a belief "that compliance achieved through education and cooperation would result in long-term dealer compliance" and that "[e]ducation was generally provided through the inspectors' interaction with dealers during routine inspections as well as periodic seminars."[6]  OIG then concluded that "relying heavily on education for serious or repeat

---

[4] *Fiscal Year 2018: Animal Care Impact Report*, Animal and Plant Health Inspection Service, U.S. Department of Agriculture at 2 (Apr. 18, 2019) ("Impact Report"), https://bit.ly/3xOXyBB.
[5] Gil H. Harden, Assistant Inspector General for Audit, *Animal and Plant Health Inspection Service, Animal Care Program, Inspections of Problematic Dealers*, USDA Office of Inspector General at 1 (May 2010) ("Audit Report"), https://bit.ly/3iwblaS.
[6] *Id.* at 1.

violators—without an appropriate level of enforcement—weakened the agency's ability to protect the animals."[7]  Yet Defendants ignored this conclusion in adopting the Customer Service Policy as official agency policy, abusing any discretion that the AWA may provide.

8.      Critically, the unlawful Customer Service Policy has enabled licensed dog dealers to commit horrible abuses without any repercussions.

9.      For example, between 2014 and 2020, Defendant APHIS's inspectors noted fifty violations of the AWA by a licensed dog dealer named Henry Sommers.  According to multiple Inspection Reports, Sommers kept dogs in dangerous housing with wire flooring.  This flooring wounded numerous dogs, rendering some unable to stand.  A 2020 Inspection Report regarding Sommers' facility noted that puppies' feet and legs were falling through the openings of the wire flooring.  Sommers has never been penalized for these documented AWA violations.

10.     Defendants' unlawful Customer Service Policy has caused, and is continuing to cause, needless, significant harm to animals and the organizations that seek to protect those animals, all in contravention of federal law.  Plaintiff thus brings suit to challenge the Customer Service Policy, which is contrary to law, *ultra vires*, arbitrary and capricious, and otherwise in violation of the APA.

## THE PARTIES

11.     Plaintiff The American Society for Prevent of Cruelty to Animals ("ASPCA") is a not-for-profit corporation created by the New York State legislature.  Founded in 1866, Plaintiff is North America's oldest humane organization and, with millions of supporters nationwide, one of the largest humane organizations in existence today.

---

[7] *Id.*

12.     Plaintiff's mission is to provide effective means for the prevention of cruelty to animals throughout the United States.

13.     As part of this mission, Plaintiff has developed a campaign to end the cruel commercial breeding of dogs.  This campaign is targeted at educating the public about cruel commercial breeders licensed and regulated by Defendants. Accordingly, the campaign was developed with the expectation that Defendants would play their regulatory role by conducting rigorous inspections of facilities, ensuring that agency records—such as Inspection Reports—accurately reflect violations of the AWA, and pursuing enforcement actions against dog dealers that violate the AWA.

14.     Because Defendants have abdicated that role, Plaintiff has been forced to change material aspects of the campaign.  All the work by Plaintiff and its members to end the cruel commercial breeding of dogs has been and will continue to be undermined by Defendants' unlawful Customer Service Policy, the resulting indifference of licensed dog dealers to the requirements of the AWA, and the free pass those dealers have to violate the AWA.

15.     Specifically, the unlawful Customer Service Policy has compelled Plaintiff to divert its limited resources from other public advocacy and education programs promoting the humane treatment of animals.  Plaintiff has been forced to counteract the actions of the licensed dog dealers that have been given free passes by Defendants, as well as to inform the public and policy makers about Defendants' abdication of their responsibilities under the AWA so that Defendants are pressured to fulfill their statutory responsibilities.

16.     For example, Plaintiff has engaged in advocacy efforts encouraging state lawmakers to fill the gap left by Defendants' unlawful Customer Service Policy and to enact legislation aimed at stopping the inhumane treatment of dogs by licensed dog dealers.  Plaintiff

has successfully advocated for such legislation in California and Maryland and is actively advocating for similar legislation in New York, Florida, and New Jersey. These advocacy efforts are taxing on Plaintiff's resources and have caused Plaintiff to incur costs associated with personnel, informational materials, blogs, and action alerts.

17.     The Customer Service Policy also compelled Plaintiff to advocate for Defendant USDA's OIG to audit Defendants' administration and enforcement of the AWA. After a year of advocacy efforts, including informational meetings with lawmakers, OIG agreed to conduct such an audit, which remains pending.

18.     Plaintiff also has spent significant resources monitoring Defendants' enforcement of the AWA so that the public and policy makers can be informed about Defendants' abdication and can take action against it. Plaintiff has submitted monthly Freedom of Information Act requests to obtain information about Defendants' enforcement efforts, and Defendants' failure to respond to several of these requests caused Plaintiff to file two lawsuits to force Defendants to respond. Plaintiff also has spent significant resources reviewing Defendants' statements since 2016—*e.g.*, impact reports, budget statements, five-year plans, informational meetings with stakeholders—to understand and document Defendants' failure to fulfill their charge.

19.     Additionally, one of the primary goals of Plaintiff's campaign is to inform Plaintiff's members and the general public of which licensed dog dealers mistreat or harm animals.

20.     In developing the campaign, Plaintiff assumed that Defendants would identify particularly bad actors through investigations and enforcement actions.

21.     Because Defendants have failed to take such actions, Plaintiff has been forced to spend significant time and resources receiving, investigating, and responding to complaints from

the public relating to dog dealers that have received *de facto* enforcement immunity from Defendants.

22.     Plaintiff also has been forced to develop messaging that explains why the public should not rely on Defendants' statistics to assess dog dealers, given Defendants' abdication and failure to provide accurate and timely public information related to enforcement.  This effort has required Plaintiff's government relations and legal advocacy teams to shift time and resources away from their normal agendas.

23.     These activities are not part of Plaintiff's normal annual expenditures and have been incurred only because of Defendants' Customer Service Policy.

24.     Defendant USDA is an executive agency within the federal government of the United States.  Defendant USDA is responsible for implementing the AWA.

25.     Defendant APHIS is a component of Defendant USDA.  Defendant USDA has charged Defendant APHIS with administering the AWA.

26.     Defendant Thomas J. Vilsack is the Secretary of Defendant USDA.  He is sued in his official capacity.

## JURISDICTION AND VENUE

27.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 as this case arises under the APA.  This Court has remedial authority under the APA.  5 U.S.C. § 706.

28.     The Customer Service Policy, which crystallizes Defendants' construction of the AWA and has significant legal consequences for licensed dog dealers, constitutes final agency action judicially reviewable within the meaning of the APA, 5 U.S.C. §§ 704 and 706.

29.     Venue is proper in this district under 28 U.S.C. § 1391(e)(1), because Defendants are executive entities of the United States that reside in this district, Defendants maintain offices

in this district, and a substantial part of the acts and omissions giving rise to this action occurred in this district.

## FACTUAL ALLEGATIONS

**A.    Statutory and Regulatory Framework**

30.    Congress enacted the AWA to "insure that animals intended . . . for use as pets are provided humane care and treatment" and "to assure the humane treatment of animals during transportation in commerce." 7 U.S.C. § 2131.

31.    To achieve these goals, Congress determined, "it is essential to regulate . . . the transportation, purchase, sale, housing, care, handling, and treatment of animals by carriers or by persons or organizations . . . holding them for sale as pets or for any such purpose or use." *Id.*

32.    Accordingly, Congress required all dog dealers to obtain licenses from the Secretary of Agriculture, *id.* § 2134, and directed the Secretary to "promulgate standards to govern the humane handling, care, treatment, and transportation of animals by dealers," *id.* § 2143(a)(1).

33.    Pursuant to this statutory mandate, Defendant USDA has established regulations that all licensed dog dealers must follow. *See* 9 C.F.R. § 2.100.

34.    These regulations specify minimum standards for housing facilities and enclosures, including standards for structures; surfaces; maintenance; cleaning; water and electric power; storage; drainage and waste disposal; ventilation; lighting; heating, cooling, and temperature; and shelter from the elements. 9 C.F.R. § 3.1–3.6. The regulations also establish standards for compatible grouping, exercise, feeding, watering, cleaning, sanitation, housekeeping and pest control, and employees. 9 C.F.R. § 3.7–3.12. Additionally, each dog dealer must establish and maintain a program of adequate veterinary care. 9 C.F.R § 2.40.

35.     To ensure compliance, the AWA provides Defendants with authority to "make such investigation or inspections as [they] deem[] necessary to determine whether any dealer . . . has violated" the AWA or the implementing regulations.  7 U.S.C. § 2146(a).

36.     Upon finding that a dealer has committed violations, Defendants have statutory authority to impose the following punishments:

a.   Temporarily suspend the dealer's license;

b.   Revoke the dealer's license;

c.   Assess a civil penalty of up to $10,000 per violation; or

d.   Issue a cease-and-desist order.

7 U.S.C. §§ 2149 (a), (b).  In order to revoke a license, assess a civil penalty, or issue a cease-and-desist order, Defendants must provide notice and opportunity for a hearing.  *Id.*

37.     When assessing a civil penalty or issuing a cease-and-desist order, Defendants must give due consideration to the size of the dealer's business, the gravity of the violation, whether the dealer was acting in good faith, and any history of previous violations.  *Id.* § 2149(b).

38.     If a dealer fails to pay a penalty, Defendants "shall request the Attorney General to institute a civil action."  *Id.*  A dealer who knowingly fails to obey a cease-and-desist order "shall be subject to a civil penalty of $1,500 for each offense, and each day during which such failure continues shall be deemed a separate offense."  *Id.*

39.     The AWA also provides that any dealer "aggrieved by a final order" may appeal that order to the relevant U.S. Court of Appeals.  *Id.* § 2149(c).

40.     Finally, if a dealer is found to have committed a violation "knowingly," the dealer may be charged criminally and is "subject to imprisonment for not more than 1 year, or a fine of not more than $2,500, or both."  *Id.* § 2149(d).

41.    Thus, the AWA's text and structure make clear that Congress intended for Defendants to secure compliance with the AWA's substantive requirements through enforcement actions.  When Defendants conduct inspections, the purpose is "***to determine*** whether any dealer . . . has violated or is violating" the AWA or the implementing regulations.  *Id.* § 2146 (emphasis added).  And the AWA authorizes USDA to impose certain enumerated penalties as consequences for AWA violations.  The AWA also provides a carefully crafted set of procedures for adjudicating penalties and ensuring their fairness.  In short, although enforcement discretion may be exercised in individual cases within the AWA framework, the AWA provides for compliance through ***enforcement***—not cooperation, education, and treating violators as "customers" to be served.

**B.    The Animal Welfare Inspection Guide's Flawed Rules**

42.    In addition to the formal implementing regulations, Defendant USDA has issued the Animal Welfare Inspection Guide ("Guide") to "provide an aid for APHIS Animal Care personnel when inspecting USDA licensed and registered facilities."  Guide § 1.1.  The Guide, most recently updated in January 2021, was created by management-level Agency personnel with substantial input, review, and approval from Defendant APHIS's Deputy Administrator for Animal Care.  The Deputy Administrator oversees all of Animal Care's employees, including inspectors.[8]

43.    Inspectors are required to conduct inspections in accordance with the Guide.  Upon information and belief, if an inspector fails to conduct inspections in accordance with the Guide, the inspector may be subject to disciplinary action.

44.    One requirement of the Guide is that, at the end of an inspection, the inspector complete an official Inspection Report as soon as possible.  Guide § 3.3.1.

---

[8] *APHIS Leadership and Biographies,* Animal and Plant Health Inspection Service, U.S. Department of Agriculture (last modified: Feb 17, 2021), https://bit.ly/3tnCQFw.

45.    The "narrative" section of the Inspection Report must include all "inspection findings," which in turn must include any "noncompliant items" ("NCIs")—*i.e.*, violations of the AWA and the implementing regulations—found during the inspection.  Guide § 2.4.

46.    The Guide labels the most serious NCIs as "Critical" NCIs.  Guide § 2.4.7.  One type of Critical NCI is a "Direct" NCI, which the Guide defines as "a Critical noncompliance that is currently (at the time of the inspection) having a serious or severe adverse effect on the health and well-being of the animal."  Guide §§ 2.4.7, 2.4.8.

47.    Despite setting forth such requirements for reports and NCIs, the Guide also contains three rules that direct inspectors to ***ignore*** many NCIs, including Critical and Direct NCIs. These are the "Teachable Moments Rule," the "Veterinary Care Rule," and the "Courtesy Visits Rule."[9]

### 1.    Teachable Moments Rule

48.    The Guide establishes that certain violations should be categorized as "Teachable Moments" and that these violations must not appear on Inspection Reports.

49.    According to the Guide, Teachable Moments are "minor NCIs identified during an inspection that meet certain criteria and are not cited on an Inspection Report."  Guide § 2.4.3. Specifically, an NCI qualifies as a Teachable Moment if:

    a.  The NCI "is not adversely impacting the health or well-being of an animal"[10];

---

[9] Until the January 2021 revision, the Guide included a fourth rule that excused NCIs:  the "Incentive Program Rule."  In January 2021, the Inspection Guide was updated to remove this Rule, as mandated by a settlement agreement Defendants reached in a separate litigation challenging the Incentive Program and Teachable Moments Rules as unlawful for failure to have been promulgated through notice and comment rulemaking.  Defendants removed the Incentive Program Rule and revised the Teachable Moments Rule pursuant to the terms of settlement. *Missouri Alliance for Animal Legislation et al v. U.S. Dept. of Agriculture et al.*, 1:19-CV-02087 (D.D.C. Jan. 25, 2021).

[10] Before the January 2021 revision, the Guide directed inspectors only to note NCIs that were "causing noticeable pain or distress to an animal."

    b.   The NCI "[i]s not a Direct or other Critical";

    c.   "The facility/site is willing and able to correct the issue quickly"; and

    d.   The NCI "[w]as not previously listed as a Teachable Moment or cited at the site within the last two years."

*Id.*

50.    Under the Guide's procedures, an inspector, after identifying all "issues" at the facility, must first determine whether each issue presents a situation of compliance (even if the situation is "an area of concern or discussion topic") or non-compliance (described by USDA as either "a teachable moment or an NCI"). *Id.* If the issue presents an instance of non-compliance, the inspector must then consider whether the issue meets the criteria to be a Teachable Moment. *Id.* Only after determining that an issue of non-compliance is not a teachable moment may the inspector determine that the issue is an NCI. *Id.*

51.    Although Teachable Moments technically are instances of non-compliance, the Guide prohibits inspectors from citing Teachable Moments on Inspection Reports. *Id.* § 2.4.1, 2.4.3. And if an inspector determines that the only instances of non-compliance at a facility are Teachable Moments, the Inspection Report must provide: "No noncompliant items documented on this inspection report." *Id.* § 2.4.1.

52.    Moreover, although inspectors must record Teachable Moments in a separate eFile database, the Guide instructs inspectors not to use "too much detail" to describe Teachable Moments. *Id.* § 2.4.3.3.

53.    Upon information and belief, because the Guide prohibits Teachable Moments from being cited on Inspection Reports, they are not referred to APHIS' Investigative and Enforcement Services for enforcement action.

54.     This "Teachable Moments Rule" first appeared in the Guide in 2016[11] and has appeared in every revised version of the Guide since.

55.     Neither the AWA nor the implementing regulations authorize or mention the concept of Teachable Moments or differentiate amongst AWA violations.

### 2.     Veterinary Care Rule

56.     The AWA and the implementing regulations require licensed dealers to provide programs of "adequate veterinary care." *See* 7 U.S.C. § 2143(a)(2)(A), 9 C.F.R § 2.40.  Yet the Guide's Veterinary Care Rule directs inspectors not to report certain veterinary issues.

57.     First, the Guide provides that inspectors shall not record "minor veterinary issues," which it defines as issues that:

    a.  Have "little or no discernible impact on an animal's overall health";

    b.  "[A]re observed in only a small number of the facility's animals"; and

    c.  "[C]an be rapidly addressed."[12]

Guide § 6.4.2.1.  Examples of "minor veterinary issues" include those relating to the animal's nails, teeth, and eyes.  *Id.*

58.     Second, the Guide provides that inspectors shall not record "serious veterinary issues that require medical attention" if one of the following sets of conditions is met:

    a.  "The veterinary care issue was identified by the facility prior to . . . inspection and the facility is authorized (for example, in the [program of veterinary care] or [a standard operating procedure]) to provide treatment for the condition

---

[11] The January 2016 Guide updates were summarized in an Agency bulletin that announced updates to Chapter 2 of the Guide titled "Inspection Procedures."

[12] Defendants reason that "a facility is maintaining adequate veterinary care because, **overall**, the facility has demonstrated it has an ongoing program that provides adequate care to animals and is, therefore, in compliance."  Guide § 6.4.2.1 (2021) (emphasis added).

without contacting the attending veterinarian, and the treatment plan is being

followed, and the animal appears to be responsive to the treatment";

b.  "The veterinary care issue was identified by the facility prior to . . . inspection,

and the facility contacted the attending veterinarian (verified by the inspector

through records, receipts and/or treatment logs or by contact[ing] the [attending

veterinarian]), and the treatment plan is being followed, and the animal appears

to be responsive to the treatment";

c.  "The veterinary care issue was identified by the facility prior to . . . inspection,

and the facility is following the authorized treatment plan or has contacted the

attending veterinarian, and the treatment plan is being followed but does not

appear to be effective (i.e., the animal's condition is clearly declining or

worsening), and the licensee has re-contacted the attending veterinarian for

additional instructions and is following those instructions (verified by the

inspector through records, receipts and/or treatment logs, or by contacting the

[attending veterinarian])";

d.  "The veterinary care issue occurred after the last daily observation on that day";

or

e.  "The veterinary care issue could not have been observed by the facility and the

facility did not have a 2.40(b)(2) or (b)(3) citation within the last 3 years."

*Id.*

59.    Like the Teachable Moments Rule, the Veterinary Care Rule prevents blatant

violations of the AWA from being cited on Inspection Reports.  But in contrast to the Teachable

Moments Rule, which at least requires Defendant APHIS to record Teachable Moments in a

14

separate database, the Veterinary Care Rule hides certain "serious veterinary issues that require medical attention" from the public entirely.

60.     This "Veterinary Care Rule" was added to the Guide in May 2018.  Since then, the Veterinary Care Rule has been incorporated into every revised version of the Guide.

61.     Neither the AWA nor the implementing regulations authorize or mention the concept of ignoring violations of the AWA's veterinary care requirements.

### 3.     Courtesy Visits Rule

62.     The Guide allows licensed dealers to request "Courtesy Visits" in order to "seek[] guidance or suggestions regarding how to ensure that they meet compliance Standards" or to "seek[] to improve their understanding of the AWA requirements, and to verify that improvements they are making meet compliance standards."  Guide § 4.8.1.  According to the Guide, "Courtesy Visits are opportunities for [Defendant APHIS] to provide learning opportunities and build relationships with facilities."  Guide § 4.8.

63.     During Courtesy Visits, inspectors must "[o]ffer to look at areas [the dealers] are concerned with, and offer suggestions for short and long-term compliance and/or where they can obtain helpful information."  Guide § 4.8.3.

64.     Most importantly, the Guide **_prohibits_** inspectors from recording NCIs during Courtesy Visits—including Direct NCIs.  Guide § 4.8.3.  Although the Guide suggests that inspectors should follow up on any Direct NCIs,[13] the Guide does not require inspectors to take any follow-up action.  Guide § 4.8.3.

---

[13] The Guide provides several examples of how to follow up: "Return and conduct an unannounced inspection in 1 or 2 days," "Return and conduct an unannounced inspection with a [Veterinary Medical Officer] in 1 or 2 days," "Call the licensee/registrant to determine what action has been taken," and "Call and discuss with the Attending Veterinarian."  Guide § 4.8.3.  The Guide also provides that "a routine unannounced inspection should be conducted within two months after a courtesy visit" and requires a standard Inspection Report for such an inspection.  _Id._ § 4.3.3.

65.     This "Courtesy Visits Rule" was added to the Guide on March 3, 2020 and was retained in the January 2021 revision.

66.     Neither the AWA nor the implementing regulations authorize Defendants to inspect the facilities of licensed dealers for any purpose other than "***to determine*** whether [the] dealer . . . has violated or is violating any provision of [the AWA] or any regulation or standard issued thereunder."  7 U.S.C. § 2146(a).

### 4.     Incentive Program Rule

67.     Until January 2021, the Guide included an "Incentive Program" that directed inspectors to ignore Critical NCIs if a dealer met certain conditions:

a.  "has no repeat or critical noncompliance on any Inspection Report for that site during the preceding 12 months";

b.  "timely discovers the non-compliance using its own compliance monitoring program";

c.  "has not voluntarily reported a non-compliance that falls within the same section and subsection of the AWA Regulations and Standards during the preceding 24 months";

d.  "immediately takes appropriate corrective action and establishes measures to prevent recurrence"; and

e.  "promptly reports the incident, orally or in writing, to its Animal Care inspector or any Animal Care office and cooperates with the inspector as he/she reviews the incident."

Guide § 2.4.2.1.2 (2020).

68.     This Incentive Program Rule was added to the Guide in May 2018. The same month, Defendant APHIS issued a Tech Note, entitled "*Incentives for Identifying, Reporting, Correcting, and Preventing Noncompliance with the Animal Welfare Act,*" that provided a detailed description of Defendant APHIS's policy of not citing violations of the AWA if those violations were discovered by dealers. Goldentyer, DVM, Aff. ¶ 8, Nov. 15, 2019, ECF No. 12-2, *Missouri Alliance for Animal Legislation et al v. U.S. Dept. of Agriculture et al,* 1:19-CV-02087 (D.D.C. Jan. 25, 2021). The Incentive Program Rule was included in every revised version of the Guide through March 2020.

69.     In January 2021, however, Defendant APHIS removed the Incentive Program Rule from the Guide as part of a settlement agreement reached by Defendants in an unrelated case. *Missouri Alliance,* 1:19-CV-02087 (D.D.C. Jan. 25, 2021). The plaintiffs in that case alleged that the Incentive Program Rule and the Teachable Moments Rule violated the APA because they were not issued pursuant to notice-and-comment rulemaking.

70.     In February 2021, Defendant APHIS issued a notice which announced that the Incentive Program and the May 2018 Tech Note are "no longer representative of the current agency policy for documenting Animal Welfare Act non-compliances."[14] The Teachable Moments Rule, the Veterinary Care Rule, and the Courtesy Visits Rule all remain in full force and effect after the January 2021 revision of the Guide.

**C.     Defendants' Policy Statements Animating The Guide Rules**

71.     In 2019, Defendants issued three Policy Statements emphasizing the importance of treating licensed dealers like "customers" and seeking to foster cooperative relationships with

---

[14] *APHIS Removes Guideline on Self-Reporting from the Animal Welfare Act Inspection Guide*, Animal and Plant Health Inspection Service, U.S. Department of Agriculture (Feb. 12, 2021), https://bit.ly/3f0n2Dx.

those dealers.  These Policy Statements inform and explain the rationale behind Defendants'
Teachable Moments Rule, Veterinary Care Rule, and Courtesy Visits Rule.

### 1.    Impact Report

72.    In early 2019, Defendant USDA issued the Fiscal Year 2018: Animal Care Impact
Report ("Impact Report").  In this report, Defendant USDA stated that its "goal is to be the most
effective and most customer-focused department in the Federal government."  Impact Report at 2.
The Impact Report further stated that Defendant APHIS "supports this goal by providing excellent
service to its customers," including by providing "fair and equitable inspections and review of
inspection report appeals, public complaints, alleged violations, and comments on rulemakings."
*Id*.

73.    The Impact Report emphasized that Defendant APHIS had "reviewed facilities with
open investigations to identify and reach out to those where additional compliance assistance
would promote the humane treatment of animals more quickly and effectively than traditional
enforcement methods (or enforcement alone)."  *Id.* at 5.

### 2.    Customer Support Statement

74.    In November 2019, Defendants published a statement entitled "Upholding the
Animal Welfare Act: How We Promote Compliance Through Customer Support" ("Customer
Support Statement").[15]  This statement proclaimed that, "[i]n recent years, [Defendant APHIS]
ha[d] expanded [its] approach to promote compliance with the Animal Welfare Act (AWA) by
using collaborative, results-driven methods" and that this approach "[g]ains faster compliance than
traditional enforcement actions."  Customer Support Statement.

---

[15] *Upholding the Animal Welfare Act: How We Promote Compliance Through Customer Support*,
Animal and Plant Health Inspection Service, U.S. Department of Agriculture (last updated Jan.
2021), https://bit.ly/2RrjgLo.

75.    The statement provided examples of techniques used to further this collaboration, including "Teachable Moments" and "Courtesy Visits."

### 3.    Five-Year Plan

76.    Also in 2019, Defendant APHIS published a Five-Year Strategic Plan (2019–2023) ("Five-Year Plan") which outlines several "Driving Forces," numerous objectives, and a list of tactics for achieving each objective.[16]

77.    One of the Driving Forces identified by the Five-Year Plan is "Delivering Services with a Customer Focus."  Five-Year Plan at 3.

78.    One of the objectives identified by the Five-Year Plan is to "Ensure the humane treatment of vulnerable covered animals."  *Id.* at 14.  And one of the tactics for achieving this objective is to "[c]ombine inspection and enforcement activities with greater learning opportunities."  *Id.*

### D.    Defendants' Unlawful Customer Service Policy

79.    Together, the Guide Rules and Policy Statements constitute and crystallize Defendant USDA's unlawful Customer Service Policy:  treat licensed dealers like customers, overlook and fail to penalize demonstrated violations of the AWA, and devote agency resources to education and cooperation efforts rather than enforcement actions.

80.    The Policy Statements unambiguously emphasize Defendants' belief that cooperation and education are more effective than enforcement.  Additionally, the Policy Statements repeatedly refer to licensed dealers as "customers" and emphasize Defendants' desire to provide licensed dealers with excellent "customer service."

---

[16] Kevin Shea, Administrator, *Strategic Plan FY 2019 – 2023*, Animal and Plant Health Inspection Service, U.S. Department of Agriculture (2019), https://bit.ly/3upvKBM.

81.     By directing inspectors to omit from Inspection Reports a wide variety of NCIs—including Critical and Direct NCIs—the Guide Rules deliberately thwart turning reported violations into potential enforcement actions.  This is so because Inspection Reports that cite observed violations are the basis for a determination by Defendants that a violation did in fact occur and that a penalty is appropriate.[17]  Thus, if an observed violation of the AWA or the Regulations is not cited on an Inspection Report, that violation cannot form the basis of an enforcement action or the imposition of a penalty.

82.     This Customer Service Policy is contrary to congressional intent.  The statute's text and structure make clear that Congress intended for Defendants to use a scheme of enforcement actions—*i.e.*, identifying violations and penalizing them—not education and cooperation (let alone exclusively), to secure compliance with the AWA's substantive requirements.

83.     In addition to providing Defendants with the authority to conduct inspections "to determine" if violations exist, the AWA includes multiple provisions to ensure that Defendants will be able to carry out these investigations effectively.  Specifically, the AWA provides that Defendants must have access to licensed dealers' facilities "at all reasonable times," 7 U.S.C. § 2146(a), that any person who tries to obstruct an inspector is subject to criminal liability, *id.* § 2146(b), and that, "[f]or the efficient administration and enforcement of [the AWA] and the regulations and standards," Defendants have the power to issue subpoenas and depose witnesses, *see id.* § 2146(c), 15 U.S.C. § 49.

84.     The AWA also provides a robust set of procedures for assessing penalties and adjudicating the fairness of those penalties.  The AWA requires Defendants to give licensed dealers notice and opportunity for a hearing before suspending a license for more than 21 days, revoking

---

[17] *Animal Welfare Act*, Animal and Plant Health Inspection Service, U.S. Department of Agriculture (Jul. 23, 2020), https://bit.ly/3b7Rt9M.

a license, imposing a civil penalty, or issuing a cease-and-desist order.  7 U.S.C. §§ 2149(a), (b).  In the same vein, the AWA provides Defendants with a list of factors that Defendants must consider when assessing a penalty, including the "size of the business," the "gravity of the violation," the dealer's "good faith," and the "history of previous violations."  *Id.* § 2149(b).  The AWA also requires Defendants to pursue civil actions—with the assistance of the U.S. Department of Justice—against dealers who fail to pay penalties.  *Id.* § 2149(b) ("Upon any failure to pay the penalty assessed by a final order under this section, the Secretary *shall* request the Attorney General to institute a civil action.") (emphasis added).  Finally, the AWA allows dealers to appeal Defendants' final orders directly to appropriate Courts of Appeals.  *Id.* § 2149(c).

85.     Defendants' unlawful Customer Service Policy simply discards all these mechanisms.  That Congress included this comprehensive set of procedures and requirements shows that Congress wanted Defendants to secure compliance with the AWA through enforcement—identifying and punishing violations.  By contrast, the AWA contains no authority for or reference to compliance through cooperation and education programs, let alone "customer service."

86.     The unlawful Customer Service Policy also directly conflicts with USDA OIG's findings that education and cooperation initiatives do not effectively secure compliance with the AWA.

87.     As noted above, in May 2010, USDA OIG released an audit report centered on Defendant APHIS's "inspections of problematic dealers."  Audit Report at 1.

88.     OIG noted that the two primary objectives of the audit were "to review [Defendant APHIS's] enforcement process against dealers that violated AWA" and "to review the impact of recent changes [Defendant APHIS] made to the penalty assessment process."  *Id*.

89.     With these objectives in mind, OIG found five "major deficiencies with APHIS' administration of AWA."  *Id*.

90.     As relevant here, the first major deficiency was that Defendant APHIS's "enforcement process was ineffective in achieving dealer compliance with AWA and regulations." *Id*.

91.     Specifically, OIG noted that Defendant USDA "believed that compliance achieved through education and cooperation would result in long-term dealer compliance and, accordingly, it chose to take little or no enforcement action against most violators."  *Id*.

92.     According to OIG, Defendant USDA's "education efforts have not always been successful in deterring problematic dealers from violating AWA" and "relying heavily on education for serious or repeat violators—without an appropriate level of enforcement—weakened the agency's ability to protect the animals."  *Id*.  Specifically, OIG found that, over a three-year period, Defendant APHIS "inspected 8,289 licensed dealers and found that 5,261 violated AWA." *Id.* at 8.  Of the 4,250 violators that Defendant APHIS re-inspected, "2,416 repeatedly violated AWA, including 863 that continued to violate the same subsections."  *Id*.

93.     Although Defendant APHIS agreed to implement OIG's recommended changes, *see* Audit Report at 14–16, the Customer Service Policy is an effort to formalize the same erroneous principles—education and cooperation as opposed to enforcement—that OIG concluded were unfounded and ineffective.  Indeed, the unlawful Customer Service Policy—by formally eschewing through the Guide Rules the recording of demonstrated AWA violations in favor of "customer service"—is an even more extreme version of USDA's flawed approach than that previously rejected by OIG.

94.     Unfortunately, Defendant APHIS's recent decision to double-down is unsurprising—for over twenty years, OIG has identified significant problems with Defendant APHIS's enforcement of the AWA and Defendant APHIS has been reticent to change.

95.     In 1992, OIG performed an audit of Defendant APHIS's enforcement of the AWA in the "Midwest Region" (Illinois, Indiana, Missouri, and Wisconsin).  James R. Ebbitt, Assistant Inspector General for Audit, *Animal and Plant Health Inspection Service — Implementation of the Animal Welfare Act*, USDA Office of Inspector General Audit Report No. 33002-0001-Ch at 1 (Mar. 16, 1992).   OIG "concluded that APHIS cannot ensure the humane care and treatment of animals at all dealer facilities as required by the act." *Id.*  Specifically, "APHIS did not inspect dealer facilities with a reliable frequency, and it did not enforce timely correction of violations found during inspections." *Id.*

96.     In 1995, OIG performed a follow-up audit and determined that, although "APHIS had taken corrective actions on most of the recommendations from [the] prior audit," APHIS "still did not reinspect all locations where serious violations had previously occurred" and "inspectors did not always properly classify those violations which endangered the health or safety of the animals."  *Animal and Plant Health Inspection Service Enforcement of the Animal Welfare Act*, USDA Office of Inspector General Audit Report No. 33600-1-Ch at ii (Jan. 1995).

97.     In 2005, OIG turned its attention to APHIS's enforcement of the AWA in the "Eastern Region" and concluded that the "Eastern Region is Not Aggressively Pursuing Enforcement Action Against Violators of the AWA."  Robert W. Young, Assistant Inspector General for Audit, *APHIS Animal Care Program — Inspection and Enforcement Activities*, USDA Office of Inspector General Audit Report No. 33002-3-SF at 4 (Sept. 30, 2005).  During OIG's investigation, an Animal Care regional manager told OIG that "the best way to achieve compliance

is through education, and enforcement actions such as fines and stipulations can at times promote hostility." *Id.* at 5.  OIG determined that this position was "arbitrary" and noted a comment by a USDA enforcement officer that the "excessive focus on education has been very de-motivating to both inspectors and investigators." *Id.* at 6.

98.     Thus, although Defendants have only recently crystallized their focus on education and customer service into a formal agency policy, the ideas that motivated this policy have been present within the agency for over two decades.  And for over two decades, Defendants' own OIG has concluded that these ideas are arbitrary and ineffective.

### E.    Legal and Practical Consequences of Defendants' Customer Service Policy

99.     As with the policy in place at the time of the Audit Report, the unlawful Customer Service Policy has caused Defendant APHIS to take "little or no enforcement action" against licensed dog dealers.

100.     Before 2016, Defendants provided the public with two ways to obtain information about violations of the AWA.  First, Defendants maintained an online database that included Inspection Reports and other similar documents.  Second, Defendants provided summaries of violations and enforcement actions directly to organizations like Plaintiff.

101.     Using these sources, Plaintiff estimated that between 2014 and 2016—the years leading up to the formalization of the Customer Service Policy—inspectors cited over 1,000 violations of the AWA by licensed dog dealers each year.

102.     After formalizing the Customer Service Policy, Defendants stopped providing information directly to Plaintiff.

103.     After formalizing the Customer Service Policy, Defendants also blocked public access to their online database, which included, *inter alia*, Inspection Reports.

104.    Thus, for the time period of 2017 through 2019, the data for the total number of violations cited on Inspection Reports per year was not easily ascertainable through publicly available information.

105.    In early 2020, Congress ordered Defendants to restore their online database.  But the restored online database does not make readily accessible the total number of violations cited on Inspection Reports per year.  Instead, groups like Plaintiff must manually total the violations from individual inspection reports to glean such information, which indicates that inspectors cited fewer than 215 observed violations of the AWA by licensed dog dealers in 2020.

106.    Thus, the 2020 data suggests that, since adopting the unlawful Customer Service Policy, Defendant APHIS has recorded approximately one-fifth as many violations by licensed dog dealers per year than it did before it adopted the policy.

107.    For the violations by licensed dog dealers that have been recorded, moreover, Defendants have imposed *no statutory penalties*.  Indeed, upon information and belief, Defendants have not imposed a single statutory penalty against a licensed dog dealer since 2017.

108.    Defendants' unlawful Customer Service Policy has enabled numerous dealers to abuse dogs repeatedly with no repercussions.  As noted above, one of the most egregious examples is the case of Henry Sommers, a licensed dog dealer who has been cited for fifty violations but received zero penalties.

109.    Another striking example involves a licensed dog dealer named Wayne Miller.  A July 2019 Inspection Report states that Miller committed a Direct Violation by failing, for nearly six weeks, to provide medical care to a Wheaten Terrier with a softball-sized vaginal prolapse. The Inspection Report also noted a violation for failing to clean and sanitize.  According to the report, Miller's facility's wash-down gutter was full of feces, old food, and maggots, and a strong

ammonia odor filled the facility.  Miller had 170 dogs and puppies on the property at the time of inspection.  Like Sommers, Miller has never been penalized for these violations.

110.    The case of Leonard Stover demonstrates how the unlawful Customer Service Policy enables licensed dealers to violate the AWA repeatedly.  Stover, whose first license was canceled in 2000, received a new license and proceeded to violate the AWA over twenty times— failing to provide veterinary care, failing to fix dangerous flooring, and failing to clean dirty cages—with no repercussions.  Additionally, in 2016, Stover received a violation for not providing access to an inspector.  Despite this history, a 2017 Inspection Report noted zero NCIs and Defendants' online database noted two Teachable Moments.  The next year, an Inspection Report noted four NCIs and Defendants' online database noted one Teachable Moment.  In 2019 and 2020, Inspection Reports noted that Stover housed puppies on dangerous gridded flooring so wide that their feet were "passing through the openings as they walked."  In fact, the situation became worse from 2019 to 2020—the number of puppies kept in such housing ballooned from five to twenty-six.  In addition, the 2020 Inspection Report noted that the housing was generally dirty. Stover has never been penalized for these violations.

111.    As a final example, a December 2015 Inspection Report for licensed dog dealer Melvin Shirk recorded an NCI for dogs with excessively matted fur.  Shirk also received a Teachable Moment related to the identification and tracking of dogs.  In January 2017, inspectors found that outdoor dog runs and indoor enclosures at Shirk's facility were filled with feces.  And in November 2017, an inspector noted a dog with matted fur, no teeth, and a mass that had not been treated by a veterinarian.  Shirk was never penalized for these violations and has not been inspected since November 2019.

112.    In short, Defendants' unlawful and deliberately undertaken Customer Service Policy has led to broad immunity for licensed dog dealers that blatantly violate the AWA and the implementing regulations.    The AWA, far from authorizing such an approach, requires identification of violations and penalties, not education, cooperation, and "customer service." USDA's deliberate failure to execute the statutory scheme as it exists has caused tremendous harm to dogs and to the organizations and people that care about those dogs.  All this harm is entirely preventable and remediable:  Defendants must simply follow the scheme for enforcement set forth in the AWA rather than seeking to rewrite the statute.

## **CAUSES OF ACTION**

### **COUNT ONE: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT**
**(Agency Action that Is Contrary to Law and *Ultra Vires*)**

113.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

114.    The Customer Service Policy is a final agency action crystallized through the successive issuance of the Guide Rules and Policy Statements.  *Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45, 49 (D.C. Cir. 2000).

115.    Under Section 706(2) of the APA, a reviewing court must hold unlawful and set aside any agency action that is "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations," or "contrary to constitutional right, power, privilege or immunity." 5 U.S.C. § 706(2).  A federal agency "literally has no power to act unless and until Congress confers power upon it."  *Mozilla Corp. v. FCC*, 940 F.3d 1, 74 (D.C. Cir. 2019) (internal citation omitted).

116.    The Customer Service Policy directs Defendant APHIS to focus its resources on education and cooperation efforts, to treat licensed dealer as customers, and to ignore a wide range of violations of the AWA.

117.    Pursuant to the Customer Service Policy, Defendant APHIS has failed to pursue any enforcement actions against licensed dog dealers since 2017.

118.    The Customer Service Policy is *ultra vires* and contrary to law.

119.    The AWA does not authorize Defendants to expend resources on educational programs for licensed dealers, let alone as a primary mechanism to secure statutory compliance. Thus, by directing most of Defendant APHIS's resources to education and customer support initiatives, the Customer Service Policy is *ultra vires*.

120.    Additionally, the text and structure of the AWA establish that Congress intended for Defendant USDA to secure compliance with the AWA's substantive requirements through a system of inspections and enforcement actions.

121.    The unlawful Customer Service Policy harms Plaintiff and thus should be declared unlawful, set aside, vacated, stayed, and enjoined.

## COUNT TWO: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
### (Agency Action that Is Arbitrary, Capricious, or an Abuse of Discretion)

122.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

123.    Section 706(2)(A) of the APA forbids agency action that is arbitrary, capricious, or an abuse of discretion.  Section 706(2) requires a reviewing court to "set aside" any agency action that violates this standard.  Among other things, this prohibition requires a federal agency to articulate a reasoned basis for any final agency action.  *Dep't of Homeland Sec. v. Regents of the*

*Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020) (noting that an agency must "engage in reasoned decisionmaking") (quotation omitted).

124.    An agency's rule is arbitrary and capricious when the agency has "entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n v. State Farm Ins.*, 463 U.S. 29, 43 (1983).  In addition, although "[a]gencies are free to change their existing policies," an agency "must at least 'display awareness that it is changing position' and 'show that there are good reasons for the new policy.'" *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125–26 (2016) (citing *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).

125.    The Customer Service Policy is arbitrary, capricious, and an abuse of discretion. Defendants failed to articulate a reasoned basis for its decision to ignore OIG's express determination that education and customer service initiatives are insufficient to secure compliance with the AWA.  Indeed, Defendants failed even to acknowledge this determination.

126.    The unlawful Customer Service Policy harms Plaintiff and thus should be declared unlawful, set aside, vacated, stayed, and enjoined.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court provide the following relief:

I.    Declare that Defendants' Customer Service Policy is contrary to law and *ultra vires*;

II.    Declare that Defendants' Customer Service Policy is arbitrary, capricious, or an abuse of discretion;

III.    Vacate and set aside Section 2.4.3 of the January 2021 Guide relating to Teachable Moments;

IV.      Vacate and set aside the provisions of Sections 6.4.2.1 and 4.8.3 of the January 2021 Guide that are inconsistent with, contrary to, or otherwise in violation of the law;

V.      Enjoin Defendants from implementation of the challenged Customer Service Policy, including but not limited to implementation of Sections 2.4.3, 4.8.3, and 6.4.2.1 of the January 2021 Guide;

VI.      Grant such additional and further relief as the Court deems just and proper.

                              Respectfully submitted,

Dated:  June 11, 2021                    By:  */s/ Kathleen Hartnett*
                                             Kathleen Hartnett (DC Bar No. 483250)
                                             COOLEY LLP
                                             3 Embarcadero Center, 20th Floor
                                             San Francisco, CA  94111-4004
                                             Telephone: (415) 693-2000
                                             Facsimile: (415) 693-2222
                                             khartnett@cooley.com

                                             Reuben Chen (*pro hac vice* motion
                                             forthcoming)
                                             Deepa Kannappan (*pro hac vice* motion
                                             forthcoming)
                                             COOLEY LLP
                                             3175 Hanover Street
                                             Palo Alto, CA  94304-1130
                                             Telephone: (650) 843-5000
                                             Facsimile: (650) 849-7400
                                             rchen@cooley.com
                                             dkannappan@cooley.com

                                             Bonnie Weiss McLeod (DC Bar No.
                                             478454)
                                             Erin Estevez (DC Bar No. 1025620)
                                             COOLEY LLP
                                             1299 Pennsylvania Ave., NW, Suite 700
                                             Washington, DC  20004-2400
                                             Telephone: (202) 842-7800
                                             Facsimile: (202) 842-7899
                                             bweissmcleod@cooley.com
                                             eestevez@cooley.com

Robert G. Hensley (*pro hac vice* motion forthcoming)
Tamara Y Feliciano *(*District of Columbia Bar Five Year Waiver application pending)
Erin E. Doran (*pro hac vice* motion forthcoming)
THE AMERICAN SOCIETY FOR THE PREVENTION OF CRUELTY TO ANIMALS
520 Eighth Avenue, 7th Floor
New York, NY 10018
Telephone: 917-716-5105
Robert.Hensley@aspca.org

*Counsel for Plaintiff*