UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE AMERICAN SOCIETY FOR THE PREVENTION OF CRUELTY TO ANIMALS, <br><br> Plaintiff, <br><br> v. <br><br> ANIMAL AND PLANT HEALTH INSPECTION SERVICE, *et al.*, <br><br> Defendants. | Case No. 21-cv-1600 (CRC) |

## MEMORANDUM OPINION

The American Society for the Prevention of Cruelty to Animals ("ASPCA") has long hounded the Animal and Plant Health Inspection Service ("APHIS") over what it views as the agency's lax enforcement of animal welfare laws against unscrupulous dog dealers. In this latest tussle, ASPCA challenges two of APHIS's rules. The first is the Courtesy Visits Rule, which permits APHIS inspectors to visit animal dealers and advise them on how to comply with welfare standards without writing up certain violations they observe during the visit. The second is the Veterinary Care Rule, under which APHIS inspectors may find dealers to be compliant with veterinary care standards even if they observe certain animal health issues during their inspections. ASPCA contends that both rules violate the Administrative Procedure Act ("APA") because they are contrary to law and arbitrary and capricious.

The parties have filed cross-motions for summary judgment. After careful consideration of the governing regulatory framework and administrative record, the Court will grant and deny each side's motion in part. In its current form, the Courtesy Visits Rule must be set aside as

inconsistent with a recently-enacted appropriations statute, whereas the Veterinary Care Rule may stand, as it is neither contrary to law nor arbitrary and capricious.

## I.    Background

APHIS is the federal agency responsible for regulating commercial animal dealers. Among its many activities, the agency runs an inspection program to ensure that dealers are complying with their regulatory obligations. This case concerns two rules that APHIS has instituted to guide agency inspectors' interactions with regulated dealers. Before turning to the analytical heart of the matter, the Court reviews the governing statutory framework and then traces the history of this long-running dispute between APHIS and ASPCA.

### A.    Regulatory Background

#### 1.    *The Animal Welfare Act & APHIS Regulations*

The Animal Welfare Act ("AWA" or "the Act") "seeks to [e]nsure the humane treatment of dogs (and other animals) raised and sold" for various purposes, including as pets. Doris Day Animal League v. Veneman, 315 F.3d 297, 298 (D.C. Cir. 2003). To this end, the Act authorizes the Department of Agriculture ("USDA") to regulate animal dealers in the United States. See 7 U.S.C. § 2131 *et seq.* USDA has delegated its regulatory authority to one of its subdivisions, APHIS. See 7 C.F.R. § 2.80(a)(6).

In order to breed, broker, or sell animals, dealers must be licensed by APHIS and submit to routine inspections. 7 U.S.C. §§ 2133, 2134, 2146(a). No license may issue unless the dealer demonstrates that its facilities comply with relevant animal welfare standards. Id. § 2133. By statute, those standards must "include minimum requirements" for "handling, housing, feeding, watering, sanitation, ventilation, shelter from extremes of weather and temperatures, adequate veterinary care, and separation by species [where necessary]," as well as for the "exercise of

dogs[.]"  Id. § 2143(a)(2).  APHIS has promulgated regulations that set these and other minimum standards of animal care and handling.  See generally 9 C.F.R. Subch. A, Part 3.

As for enforcement, the AWA provides that the agency "shall make such investigations or inspections" as is "necessary to determine whether any dealer . . . has violated or is violating" a statutory or regulatory provision.  7 U.S.C. § 2146(a).  The agency also "shall, at all reasonable times, have access to [regulated parties'] places of business and the facilities, animals, and those records required to be kept" under the Act.  Id.  APHIS regulations establish an inspection regime under which dealers are periodically visited by inspectors who assess compliance and prepare reports with their findings.  See generally 9 C.F.R. Subch. A, Part 2.  Licensees may appeal inspection findings, see 9 C.F.R. § 2.13, but the AWA requires APHIS to make all final inspection reports publicly available online, see 7 U.S.C. § 2146a(b)(1).

As APHIS explains in its briefing, "inspection reports are only the first step" in the enforcement process; once inspectors log observed violations in the agency's online system, APHIS staff review those reports of non-compliance to determine whether further investigation or administrative enforcement is warranted.  APHIS Motion for Summary Judgment ("MSJ"), ECF No. 54, at 4–5.  If APHIS concludes that an animal dealer has violated animal welfare standards, the agency may (but is not strictly required to) suspend the dealer's license temporarily or permanently; impose civil penalties; and/or refer the matter to the Attorney General for criminal or civil enforcement in a United States district court.  7 U.S.C. §§ 2149, 2159.

### 2.  *The Animal Welfare Inspection Guide*

APHIS regularly publishes the Animal Welfare Inspection Guide ("the Guide"), a manual that instructs agency personnel how to conduct inspections and document their findings.  See

generally Certified Administrative Record ("C.A.R.") 9462–9824 (reproducing the version of the Guide last revised in June 2025).

According to the Guide, an inspector "must complete an official Inspection Report as soon as possible at the end of the inspection." C.A.R. 9524 (emphasis removed). If the inspector observes any violations of APHIS regulations or standards, referred to as "noncompliant items" or "NCIs," the Guide instructs the inspector to document them in the "narrative" section of the report. C.A.R. 9478. The Guide also requires inspectors to classify the type of NCI they observe. An NCI is a "Repeat" non-compliance when it has already been cited in the recent past. C.A.R. 9479. An NCI is "Recurring/Chronic" when "the same or a similar noncompliance" has previously occurred, but not in consecutive inspections; in other words, that label applies when the NCI is "cited on one inspection, corrected by the next inspection, then re-occurs on the third and/or a subsequent inspection." Id. And an NCI is "Critical" when, among other things, it has had "a serious or severe adverse effect on the health and well-being of [an] animal." C.A.R. 9480. The Guide lists several examples of Critical NCIs, including but not limited to: "[l]ack of an attending veterinarian with documented adverse effects on the health or well-being of an animal that require immediate veterinary care"; "[a]ctions or inactions of unqualified personnel resulting in documented, adverse effects on the health or well-being of an animal"; a "[h]andling violation that resulted in death or serious injury to an animal"; or "[e]scape of an animal resulting in adverse effects on the health or well-being of the animal."[1] Id.

---

[1] The Guide also identifies a number of miscellaneous NCIs that qualify as "Critical." For instance: the "intentional[] falsifi[cation]" of records; the "handling of an animal in a manner that results in an animal attack or physical contact between an animal and a member of the public"; the "[i]nterference with, harassment, [or] abuse" of an APHIS official; and the obtaining of animals by an improperly unlicensed or prohibited source, among other non-compliant activities. C.A.R. 9480–81.

The final type of NCI is a "Direct" non-compliance, which is a "Critical noncompliance that is currently (at the time of the inspection) having a serious or severe adverse effect on the health and well-being of the animal."  C.A.R. 9481 (emphasis removed).  According to the Guide, timing is the only difference between a Critical and Direct NCI; an inspector is to ask "whether [the non-compliance] has a **current** serious or severe adverse impact at the time of the inspection," and "[t]he severity of an NCI at the time of a prior adverse incident has no impact on whether an NCI should be marked as a Critical or a Direct."  Id. (emphasis in original).

B.  Factual and Procedural Background

ASPCA is an animal rights advocacy organization whose mission is to "provide effective means for the prevention of cruelty to animals throughout the United States."  Hensley Decl. ¶ 5.  ASPCA relies in part on APHIS's inspection reports to identify dealers who mistreat dogs and bring them to the public's attention.  Id. ¶ 6.  ASPCA also uses information in the reports to engage in "direct intervention" to rescue dogs.  Id. ¶¶ 6, 12–14.

When ASPCA first filed this lawsuit in 2021, it took aim at what it coined APHIS's "Customer Service Policy," which encompassed several distinct rules[2] in the Guide that govern inspector conduct.  See Amended Compl. ¶ 3.  According to ASPCA, the Customer Service Policy unlawfully directed APHIS employees to treat animal dealers as "customers" they should support, rather than parties they must regulate.  Id. ¶ 5.  Since 2021, APHIS has amended or repealed several of the rules with which ASPCA originally took issue.[3]  See ASPCA MSJ, ECF No. 51, at 7 n.3, 18–19, 22 n.16.  Those changes leave just two rules in dispute.

_____

[2]  Although the parties refer to these policies as "rules," the Court clarifies that they are not formal legislative rules that have been subjected to the notice-and-comment rulemaking process.

[3]  For example, APHIS's Incentive Program Rule required inspectors to omit regulatory non-compliance items from their reports if, among other things, a dealer self-reported; it was

1.  *The Courtesy Visits Rule*

The first rule at issue in this case is APHIS's Courtesy Visits Rule. The Court first describes the agency's courtesy visits program as a whole and then homes in on the particular aspect of the program that ASPCA challenges in this case.

Since at least 2015, APHIS has permitted its inspectors to engage in voluntary discussions and/or visits with animal dealers regarding their AWA compliance. C.A.R. 5252–54. APHIS views these interactions as "educational" in nature, C.A.R. 5254, intended both as a "learning opportunit[y]" for dealers seeking to understand how to comply with welfare standards and as a chance for inspectors to "build relationships with" the facilities they regulate, C.A.R. 8831. Courtesy visits also allow inspectors to "check on the welfare of the animals at facilities where access has been limited." C.A.R. 5326.

APHIS formalized the courtesy visits program and incorporated it into the inspection Guide as early as 2019. See C.A.R. 5326–27. Today, the Guide outlines several different types of courtesy visit an inspector may conduct: (1) a visit with an as-yet-unlicensed facility that is preparing for its first licensing inspection; (2) a visit with a licensed facility to "follow up on compliance concerns"; (3) a visit with a licensed facility to review a new project or change in circumstances; or (4) a visit with a facility's attending veterinarian, so long as the inspector does not "discuss a potential NCI or a specific veterinary care issue identified during an inspection[.]" C.A.R. 9571. A courtesy visit comes about in one of two ways: Either a dealer requests one, or the Guide requires an inspector to offer a visit because, after multiple attempts at unannounced inspection, the inspector has been unable to access the facility. C.A.R. 9554–55. If a courtesy

---

discontinued in 2021 as part of a settlement in another lawsuit. ASPCA MSJ, ECF No. 51, at 7 n.3. The agency's Teachable Moments Rule allowed inspectors not to record certain minor non-compliances on inspection reports, and it was rolled back in 2022. Id.

visit follows on a series of failed inspection attempts, the inspector must attempt another routine, unannounced inspection within two months of the visit.  C.A.R. 8816, 9556.

For years, the Guide has instructed inspectors *not* to document the results of a courtesy visit walkthrough or review.  See C.A.R. 5327, 8816, 9555.  While this case was pending, however, Congress passed the Consolidated Appropriations Act of 2023, Pub. L. No. 117-328, 136 Stat. 4506 (Dec. 29, 2022).  As relevant here, Section 756 of that statute provides:

> Hereafter, none of the funds made available by this Act or any other Act, may be used to pay the salaries or expenses of personnel to implement any activities related to the permitting of non-recording of observed violations of the Animal Welfare Act or its regulations on official inspection reports.

"In light of this congressional direction," APHIS "reevaluated" its courtesy visits initiative in 2024 and decided that "updating" the program to "provide for a focused inspection and a written inspection report documenting direct [NCIs] observed during a [courtesy visit] would close a perceived gap in making all [NCIs] observed publicly available."  C.A.R. 9087. As a result, the 2024 update to the Guide required that, when an inspector carried out a courtesy visit to a licensed facility, she must "cite" any observed Direct NCI on a "focused inspection report"[4] and "inform the facility that an unannounced inspection [would] be conducted to follow-up on the direct [NCI]."  C.A.R. 8833.  If an inspector observed a "'Direct' animal welfare problem[]" on a courtesy visit to an *un*licensed facility, she would have to contact her supervisor and, if necessary, alert local law enforcement or a state animal welfare group.  C.A.R. 8832.

In April 2025, after the Court heard argument on the parties' cross-motions for summary judgment, it solicited supplemental briefing on Section 756's impact on this case.  Shortly

---

[4]  A focused inspection is an unannounced "partial" inspection—for instance, one that focuses only on specific non-compliances identified in previous inspections, on a specific part of the facility, or on a specific issue identified by a public complaint of animal mistreatment. C.A.R. 9527.

thereafter, APHIS amended the Guide to clarify one further point.  While inspectors were still generally "not [to] document the results of the walkthrough or review during [a] courtesy visit[,]" C.A.R. 9555, an inspector who observed a Direct NCI was to "convert[]" the visit into a "focused inspection" and document *all* NCIs observed during that focused inspection—not just Direct NCIs, as the 2024 version of the Guide had implied.  C.A.R. 9461.  In a memorandum accompanying the 2025 Guide, APHIS's Deputy Administrator stressed that this revision was meant to further align the courtesy visits program with Section 756:  Per the statutory text, if an agency employee "observes violations of the [AWA] or its regulations during an inspection," she "must record those violations on official inspection reports[,]" and agency "leadership" would "not instruct . . . employees not to record other observed violations" once a focused inspection had begun.  C.A.R. 9460–61.

        That brings us up to date.  To recap: in its current form, the Guide authorizes inspectors to carry out different kinds of courtesy visits with both non-regulated entities and regulated entities (including dealers and veterinarians), but an instructor is generally not to document the results of any walkthrough or review unless she observes a Direct NCI during a courtesy visit with a licensed facility.  In that case, she must end the visit, conduct a focused inspection, and cite the dealer for all violations observed during that inspection.  C.A.R. 9555, 9572.

        As the foregoing discussion reflects, the courtesy visits protocol is not so much a singular "rule" as it is a program with multiple subparts that apply depending on the nature of the subject in question (licensed or non-licensed, facility or veterinarian) and the type of visit (pre-licensure visit, non-compliance follow-up, change-in-circumstance visit, or veterinary consultation).  See C.A.R. 9570–72.

The sweep of APHIS's courtesy visits initiative complicates the task of identifying what aspect of the program ASPCA is challenging—and ASPCA has not been entirely clear.  Echoing its initial broadside against APHIS's "Customer Service Policy," ASPCA suggests, at points, that courtesy visits are categorically unlawful in all forms.  See, e.g., ASPCA MSJ Reply Br., ECF No. 58, at 3 (explaining that the customer service policy is unlawful because "it affirmatively bestows benefits upon dog dealers—including free consultation services and immunity for entire classes of violations—absent one word of authority from the Act to do so"); id. at 18–19 ("What ASPCA challenges is Defendants' categorical Policy, embodied in two Rules, directing that observed noncompliance with the Act go unrecorded such that dealers receive blanket immunity and further directing that dog dealers receive affirmative benefits nowhere provided for by the Act itself (e.g., free consulting services in the form of Courtesy Visits)."); id. at 29 (". . . Courtesy Visits have *never* factored in animal welfare in any meaningful respect." (emphasis in original)).  Yet, a complete reading of the docket and record reveals a narrower target.

In its Amended Complaint, ASPCA requested that the Court "[v]acate and set aside the *provisions*" of *Section 4.8.3* of the January 2021 Guide "that are inconsistent with, contrary to, or otherwise in violation of law."  Amended Compl. at 46 (emphasis added).  Although the Guide has evolved since the case was filed, Section 4.8.3 was and still is the sub-section that bars inspectors from recording violations they observe during courtesy visits.  ASPCA's summary judgment briefing confirms that the gravamen of its challenge is that the courtesy visits program allows inspectors to visit animal facilities while simultaneously "prohibit[ing]" them "from recording several categories of violations of the [AWA]."  ASPCA MSJ, ECF No. 51, at 1 (emphasis removed); see also ASPCA MSJ Reply Br., ECF No. 58, at 2 ("ASPCA is . . . challenging . . . Defendants' promulgation of a Policy—embodied in two Rules—that

affirmatively immunizes violations of the Act from leading to consequences."); MSJ Hearing Tr. at 5:3–13 (ASPCA is "not challenging some amorphous customer service policy," but instead the set of rules coming "from the basic flawed notion . . . that there will be inspections at which inspectors from the agency do not write down noncompliance.").

When ASPCA refers to the "Courtesy Visits Rule," the Court therefore understands it to mean not the entire courtesy visits program—which could survive, conceptually, without the bar on recording certain statutory violations, and encompasses many features that the briefing says next to nothing about—but rather that *specific* part of the courtesy visits section of the Guide which prohibits inspectors from recording observed statutory violations.  Cf. MSJ Hearing Tr. at 18:15–19:3 (ASPCA counsel acknowledging that "educational efforts can happen" at courtesy visits, but arguing that inspectors should not "be told by the [G]uide" not to "write . . . down" the non-compliances they observe).

### 2. The Veterinary Care Rule

The second rule at issue in this case is the Veterinary Care Rule.  To understand its contents, some context is in order.  Both the AWA and APHIS regulations require that animal dealers meet minimum veterinary care requirements.  See 7 U.S.C. § 2143(a)(2)(A); 9 C.F.R. §§ 2.40, 3.13.  Every licensed animal dealer must have "an attending veterinarian who shall provide adequate veterinary care to its animals" and "establish and maintain programs of adequate veterinary care that include," *inter alia*, (1) "[t]he use of appropriate methods to prevent, control, diagnose, and treat diseases and injuries, and the availability of emergency, weekend, and holiday care"; and (2) "[d]aily observation of all animals to assess their health and well-being[,]" which may be done by someone other than the attending veterinarian as long as "timely and accurate information" as to animal health issues is conveyed to that veterinarian.  9 C.F.R. §

2.40(a)–(b).  In addition to this generic program of care, dog dealers "must follow an appropriate program of veterinary care for dogs that is developed, documented in writing, and signed by the attending veterinarian."  9 C.F.R. § 3.13(a).  The program must ensure that there are regularly scheduled visits and physical examinations by the attending veterinarian, vaccinations and sampling and treatment of parasites and pests, and "[p]reventative care and treatment to ensure healthy and unmatted hair coats, properly trimmed nails, and clean and healthy eyes, ears, skin, and teeth[.]"  9 C.F.R. § 3.13(a)(1)–(4).

The Guide instructs inspectors how to assess dealers for compliance with veterinary care standards:  "Upon inspection, [inspectors] should evaluate the appearance and condition of the animals as well as the facility, to determine whether the overall veterinary care program is adequate to ensure that proper care is being rendered, and whether the facility is following its written program of veterinary care."  C.A.R. 9660.  According to the Guide,

> An animal is considered to have received adequate veterinary care if it has been:
> - Discussed with or examined and evaluated by a qualified veterinarian (either the attending or a consulting) in a timely manner, and
> - Prescribed a treatment plan which is appropriate for the animal's condition, potentially including further observation without treatment if appropriate, and
> - Treatments have been administered as prescribed

Id. (emphasis removed).  The Guide also underscores that "[t]he outcome of the treatment is **not** the determining factor for the adequacy of veterinary care, provided that the care is in keeping with appropriate standards of veterinary care."  Id. (emphasis in original).  This definition of "adequate veterinary care," along with the latter caveat, has consistently appeared in the Guide since at least 2015.  See C.A.R. 1274–75.

ASPCA challenges the portion of the Guide—namely, Section 6.4.2.1, "Determining Adequate Veterinary Care"—that provides examples of compliance and non-compliance with veterinary care standards.  C.A.R. 9660–62.  The relevant section begins:  "If there are **minor**

veterinary issues (e.g., nails, teeth, minor injuries, and eyes) with little or no discernible impact on an animal's overall health **and** that are observed in only a small number of the facility's animals, **and** the issues can be rapidly addressed, a facility is maintaining adequate veterinary care because, overall, the facility has demonstrated that it has an ongoing program that provides adequate care[.]"  C.A.R. 9660–61 (emphasis in original).  Even "[i]f an inspector identifies one or more animals with **serious** veterinary issues that require medical attention, or more than a small number of animals experiencing minor veterinary conditions," a facility may still be in compliance if: (1) the dealer has identified the veterinary care issue, is authorized to treat the issue on its own, and the treatment appears to be working; (2) the dealer has identified the veterinary care issue and is working with the attending veterinarian to address it; (3) the issue "occurred **after** the last daily observation on that day"; or (4) the issue "could not have been observed by the facility **and** the facility did not have a [9 C.F.R. §] 2.40(b)(2) or (b)(3) citation within the last 3 years."  C.A.R. 9661 (emphasis in original).

The Guide continues by enumerating a number of circumstances in which an animal dealer is *not* in compliance with relevant standards and thus should be cited—for instance, when the relevant veterinary care issue was not "identified by the facility prior to . . . inspection," and the attending veterinarian is not comfortable with how the dealer is addressing the issue or the dealer did not contact the attending veterinarian.  C.A.R. 9661–62.  The examples listed here of compliant and non-compliant conduct are not exhaustive.

* * *

ASPCA asserts that the Courtesy Visits Rule and Veterinary Care Rule are contrary to law and arbitrary and capricious, and therefore must be set aside under the APA.  The parties filed cross-motions for summary judgment.  After a hearing on the motions, the Court solicited

supplemental briefing as to Section 756's impact on this case. The motions are now ripe for resolution.

## II.    Legal Standard

At summary judgment, the court must determine whether the challenged agency action complies with the APA and is supported by the administrative record. See Richards v. INS, 554 F.2d 1173, 1177 (D.C. Cir. 1977). Under the APA, "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A). Arbitrary and capricious review is "narrow," Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971), and precludes the reviewing court from "substitut[ing] its judgment for that of the agency[,]" Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). Rather, the court must determine whether the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." Id. (internal quotation marks omitted). A court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Nat'l Ass'n of Home Builders v. Defs. of Wildlife, 551 U.S. 644, 658 (2007) (citation omitted).

## III.   Analysis

The Court will begin with three threshold issues raised by the agency: standing, final agency action, and commitment to agency discretion. Finding that none prevent judicial review, the Court will then proceed to the merits and grant and deny both motions for summary judgment in part.

A. <u>Threshold Requirements</u>

    *1. Standing*

Before this case can go any further, ASPCA must "answer a basic question:  What's it to you?" <u>FDA v. All. for Hippocratic Medicine</u>, 602 U.S. 367, 379 (2024) (cleaned up).  In legalese, ASPCA must demonstrate that (1) it has been concretely injured; (2) its injury is traceable to APHIS; and (3) the relief it seeks would redress that injury. <u>Id.</u> at 380–81.  And because ASPCA is an organization, it must identify a "concrete and demonstrable injury to its activities beyond a mere setback to its abstract social interests." <u>Humane Soc'y of the U.S. v. USDA</u>, 41 F.4th 564, 567 (D.C. Cir. 2022) (cleaned up).  Where an organization's activities are directly regulated by the challenged government action, "there is ordinarily little question" that the organization has standing. <u>Lujan v. Defs. of Wildlife</u>, 504 U.S. 555, 561–62 (1992).  But the rules at issue in this case govern animal dealers.  ASPCA is not a licensed animal dealer and is not subject to either the Courtesy Visits Rule or the Veterinary Care Rule.  As a result, "much more is needed" from ASPCA, as its "asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else[.]" <u>Id.</u> at 562 (emphasis removed).

ASPCA's standing is supported by a long line of D.C. Circuit cases holding that animal rights groups had standing to challenge agency actions related to "animal-rescue and cruelty-prevention activities[.]" <u>Ctr. for Biological Diversity v. U.S. Dep't of the Interior</u>, 144 F.4th 296, 315 (D.C. Cir. 2025) (citing <u>Am. Anti-Vivisection Soc'y v. USDA</u>, 946 F.3d 615, 619 (D.C. Cir. 2020); <u>PETA v. USDA</u>, 797 F.3d 1087, 1095 (D.C. Cir. 2015)).  For instance, in <u>Am. Anti-Vivisection Soc'y</u>, an animal rights group challenged USDA's failure to issue standards for the humane handling and care of birds not bred for use in research.  946 F.3d at 617.  The D.C. Circuit straightforwardly concluded that the plaintiff had standing to seek redress for the

agency's inaction because it "field[ed]" and "respond[ed] to complaints of cruelty to birds[,]" and without federal standards of care, the organization had been forced to issue its own guidance to help facilities tend to the needs of birds and "gauge" various incidents of "cruelty to birds" that the organization learned of.  Id. at 619 (cleaned up).  Similarly, in PETA, the Circuit concluded that the plaintiff had standing to challenge the USDA's failure to issue inspection reports on the welfare of birds held in captivity because the agency's inaction shifted the burden to PETA to "investigate and respond to complaints about birds subjected to inhumane treatment" and "obtain appropriate and necessary relief for these animals[.]" 797 F.3d at 1095–96.

Here, ASPCA asserts that the government's failure to protect animal welfare is forcing it to make "programmatic expenditures" to "fill the gap left" by APHIS.  Ctr. for Biological Diversity, 144 F.4th at 315.  ASPCA has submitted a declaration explaining that its "mission is to provide effective means for the prevention of cruelty to animals throughout the United States." Hensley Decl. ¶ 5.  The challenged rules imperil that mission.  Most pertinently, ASPCA reports having to expend resources to counteract animal abuse by "rescu[ing] animals from crisis situations created by Defendants' unlawful Policy."  Id. ¶ 12.  ASPCA's declaration describes one example where a local organization needed assistance to rescue approximately 500 dogs from a breeder whose statutory violations, according to the affidavit, went largely unrecorded due to the challenged rules.  Id. ¶¶ 13–14.  ASPCA provided $100,000 in funding to assist the local organization and provided planning, transportation, and healthcare services to care for the rescued animals.  Id. ¶ 14.  According to ASPCA's declaration, these resources were diverted from the organization's ordinary expenditures and "were not part of" the "normal annual outlay of resources[.]"  Id. ¶¶ 8, 14.  Such resource drain harms ASPCA's ability to protect animal welfare through its "own activities," Ctr. for Biological Diversity, 144 F.4th at 315, such as

15

public advocacy and education, Hensley Decl. ¶ 8.  Accordingly, ASPCA has suffered a sufficiently concrete injury.[5]

Moreover, ASPCA's injury is likely to recur in the future.  Because ASPCA is seeking prospective injunctive relief, it must prove that it faces "a real and immediate threat of repeated injury."  Murthy v. Missouri, 603 U.S. 43, 58 (2024) (citation omitted).  Here, the challenged policies are prospective, and APHIS offers no reason to think that they will be amended or repealed soon.  APHIS inspectors will therefore continue to apply these policies and not record certain violations and health issues they observe during courtesy visits and inspections.  That gap will in turn continue to force ASPCA to fill the void created by APHIS's reporting guidelines.  See Hensley Decl. ¶ 5.  As a result, ASPCA has adequately demonstrated that APHIS's alleged underreporting of animal welfare violations will cause injury going forward.

ASPCA's injuries are also traceable to APHIS's policies.  In PETA, the Circuit held that the government's failure to promulgate bird-specific regulations caused an injury to PETA by depriving it of inspection reports that PETA used to counter bird abuse.  797 F.3d at 1094–95.  Similarly, in Humane Soc'y, the Circuit held that "absent a more rigorous inspection regime,"

---

[5] Contrary to APHIS's suggestion, ASPCA has not manufactured this injury just because "rescuing dogs is the very purpose of [ASPCA's] National Field Response team[,]" and the organization would presumably continue to rescue dogs even in the absence of the challenged agency rules.  APHIS MSJ, ECF No. 54, at 21–22; APHIS MSJ Reply Br., ECF No. 62, at 6.  What matters is whether the agency's conduct has "perceptibly impair[ed]" ASPCA's ability to carry out its operations.  Cap. Area Immigrants' Rts. Coal. v. Trump, 471 F. Supp. 3d 25, 38 (D.D.C. 2020) (quoting Food & Water Watch, Inc. v. Vilsack, 808 F.3d 905, 919 (D.C. Cir. 2015)).  Although a plaintiff may not "convert . . . ordinary program costs into an injury in fact," id. at 41 (quoting Nat'l Taxpayers Union, Inc. v. United States, 68 F.3d 1428, 1434 (D.C. Cir. 1995)), ASPCA's declaration explains that APHIS's rules "make it harder for [the organization] to provide . . . core . . . services," including public advocacy and education, and have also created and exacerbated "crisis situations" necessitating ASPCA's direct intervention, id. at 40–41; see also Hensley Decl. ¶¶ 8, 12–14.  ASPCA's injury is thus sufficiently concrete and not self-imposed.

the plaintiff had to "redirect its limited time and resources away from existing horse protection work to . . . counteract continuing soring activities." 41 F.4th at 567–68. This case is more of the same. Because of unreported NCIs, ASPCA says it must divert resources toward "counteract[ing]" dog breeder abuses such as those that necessitated the rescue operation described above. See id. at 568. Under ASPCA's legal theory, the Courtesy Visits Rule and Veterinary Care Rule lead to the non- or under-documentation of observed animal welfare issues on public reports, requiring ASPCA to go to additional lengths to prevent animal abuse. ASPCA has therefore definitively proffered that APHIS's lack of reporting has caused (and will continue to cause) injuries to the organization.

For similar reasons, ASPCA's injury is redressable by enjoining the implementation of the two rules. Causation and redressability "are often flip sides of the same coin." All. for Hippocratic Medicine, 602 U.S. at 380 (quotation marks omitted). Because APHIS's policies cause its employees not to record the full panoply of violations they observe, enjoining those policies would permit inspectors to document observed violations in inspection reports. That, in turn, would relieve pressure on ASPCA to fill the void left by APHIS's supposedly deficient enforcement scheme and could reasonably be expected to lead to intervention before conditions at certain dog dealers have become too dire. See Massachusetts v. EPA, 549 U.S. 497, 526 (2007) (finding redressability where the "risk" of harms caused by climate change "would be reduced to some extent if petitioners received the relief they seek").

To be sure, APHIS inspectors may not be required by law to record everything that ASPCA wants to know about how dealers are treating the animals in their care. But that is a merits issue, not a standing one. At the standing stage, courts must "assume that on the merits the plaintiffs would be successful in their claims." Tanner-Brown v. Haaland, 105 F.4th 437,

17

444 (D.C. Cir. 2024) (quoting City of Waukesha v. EPA, 320 F.3d 228, 235 (D.C. Cir. 2003)

(per curiam)).

APHIS contends that the Supreme Court's recent decision in FDA v. All. for Hippocratic

Medicine undermines the D.C. Circuit's animal rights standing caselaw.  See, e.g., APHIS MSJ,

ECF No. 54, at 18; MSJ Hearing Tr. at 30:7–18.  In that case, an organization sued to challenge

the FDA's relaxation of regulatory requirements for the abortion drug mifepristone.  602 U.S. at

372–73.  The organization did not prescribe mifepristone, nor did its members use it.  Id. at 373.

Instead, it claimed it had organizational standing because the government's decision to make

mifepristone more available "forced" it to "expend considerable time, energy, and resources"

educating the public and advocating against mifepristone "to the detriment of other spending

priorities."  Id. at 394.  The Supreme Court rejected that standing theory, clarifying that an

organization "cannot spend its way into standing simply by expending money to gather

information and advocate against the defendant's action."  Id.  APHIS asserts that ASPCA is

taking a similar tack here.

But the D.C. Circuit recently distinguished many of its animal protection cases from All.

for Hippocratic Medicine.  In Ctr. for Biological Diversity, the Circuit considered whether an

organizational plaintiff could assert standing based on allegations that the government's failure

to engage in the Endangered Species Act consultation process "deprived [the organization] of

information about federal agency actions' impact on species and so harmed its ability to fulfill its

organizational mission."  144 F.4th at 303.  The court concluded that the plaintiff lacked standing

because it did not "assert an injury to its non-advocacy operations analogous to the harms to

animal-rescue and cruelty-prevention activities that [has] supported organizational standing" in

cases like PETA and Am. Anti-Vivisection Soc'y.  Id. at 315.  "[W]ork[ing] harder" to "lobby

the federal government, file rulemaking petitions, request improved policies, and in other ways urge the government to better protected endangered and threatened species and habitats"—in short, enhancing "issue advocacy" efforts—does not constitute a sufficient injury for Article III standing. Id. But Ctr. for Biological Diversity confirms that an animal welfare organization's "programmatic expenditures[,]" made to "fill the gap" left by an agency's failure to act, may be constitutionally sufficient. Id. Framed another way, organizational injury occurs where "the challenged action 'directly affect[s] and interfere[s] with [a plaintiff's] core business activities.'" Id. (third alteration in original) (quoting All. for Hippocratic Medicine, 602 U.S. at 395–96).

Here, ASPCA's expenditures are not limited to issue advocacy. The organization funds animal rescues nationwide, see Hensley Decl. ¶¶ 12–14, and investigates specific dog dealers to uncover abuses, id. ¶ 10—all part of its core mission to prevent animal cruelty. The challenged rules make ASPCA's work harder. Its injury is therefore distinct from those asserted in All. for Hippocratic Medicine and Ctr. for Biological Diversity, and fits cleanly within the line of D.C. Circuit precedent recognizing that organizations that fight animal cruelty through direct intervention have standing to challenge agency action that hinders that work.

### 2. Final Agency Action and Committed to Agency Discretion

The next two threshold issues, final agency action and committed to agency discretion, are much more straightforward. The parties spilled considerable ink on these two requirements in their papers; the Court will devote considerably less in concluding that both are satisfied.

*First*, ASPCA has disclaimed any challenge to anything broader than the Courtesy Visits Rule and Veterinary Care Rule. ASPCA MSJ Reply Br., ECF No. 58, at 17; see MSJ Hearing Tr. at 4:25–5:4 ("[W]e are currently challenging two rules . . . [and] we're not challenging some amorphous customer service policy."). And APHIS concedes that these discrete rules are final

agency action.  See APHIS MSJ, ECF No. 54, at 38 n.11; APHIS MSJ Reply Br., ECF No. 62, at

12; MSJ Hearing Tr. at 47:11–15 ("[T]o the extent plaintiff is challenging the promulgation in

the guide or inclusion in the guide of courtesy visits and . . . these five paragraphs of examples in

the veterinary care section, . . . that is final agency action.").  With these concessions, the Court

concludes that the challenged rules are final agency action.

     *Second*, APHIS abandoned any argument that the challenged rules are unreviewable

because they are committed to agency discretion.  See APHIS MSJ Reply Br., ECF No. 62, at 13

("To be clear, Defendants did not contend that [APHIS's] inclusion of the Courtesy Visits and

Veterinary Care section of the Guide was also committed to agency discretion."); MSJ Hearing

Tr. at 47:15–17 ("[The government is] not actually advancing a Heckler v. Chaney argument

with respect to reviewability of the inclusion of [the challenged rules in] the guides.").  The

Court therefore also finds that the challenged rules are not committed to agency discretion.

     B.  <u>Merits</u>

     The Court now turns to the merits of ASPCA's APA claims.  Originally, ASPCA

contended that the Courtesy Visits Rule and the Veterinary Care Rule are contrary to the AWA

and its implementing regulations, as well as arbitrary and capricious.  After the Court solicited

supplemental briefing from the parties, ASPCA added that the Courtesy Visits Rule contravenes

Section 756 of the Consolidated Appropriations Act of 2023 ("the Appropriations Act").

     The Court weighs each rule in succession, concluding that neither is directly contrary to

the AWA or its implementing regulations.  But the Court elects to consider ASPCA's latter

argument and finds that the Courtesy Visits Rule—as delineated above—is inconsistent with

Section 756.  That rule must therefore be set aside as contrary to law.  The Veterinary Care Rule,

by contrast, withstands ASPCA's challenge.

### 1. Courtesy Visits Rule

#### a. Contrary to Law

##### i. Animal Welfare Act

ASPCA contends that the Courtesy Visits Rule runs afoul of the AWA for two reasons: (1) the Act requires the agency to conduct inspections "for the sole purpose of determining" whether animal dealers have violated the relevant regulatory standard, and the rule precludes inspectors from recording a swath of observed statutory violations, ASPCA MSJ, ECF No. 51, at 26–28; and (2) the Act does not authorize APHIS to use education or voluntary compliance efforts "as a substitute for enforcement," id. at 28–29.  Neither dog hunts.

"The primary purpose of the [AWA] is to ensure the humane care and treatment of various animals[.]"  Animal Legal Def. Fund, Inc. v. Espy, 29 F.3d 720, 722 (D.C. Cir. 1994). To this end, the Act obligates APHIS to promulgate certain minimum standards for humane care and handling and to monitor animal dealers for compliance with those standards.  7 U.S.C. §§ 2143(a)(1)–(2), 2146(a).  At the same time, the agency enjoys substantial latitude in administering the Act.  See, e.g., 7 U.S.C. § 2151 (APHIS "is authorized to promulgate such rules, regulations, and orders as [it] may deem necessary in order to effectuate the purposes of this chapter.").

In terms of enforcement, APHIS "shall make such investigations or inspections as [it] deems necessary to determine whether any dealer . . . has violated or is violating any provision" of the statute or "standard issued thereunder[.]"  7 U.S.C. § 2146(a).  According to the text of the statute, the agency *must* undertake "investigations or inspections" in order to "determine whether any dealer" has violated the regulatory standards.  But by including the language "as [it] deems necessary," Congress left it to the agency to decide when and how to do so.

ASPCA latches onto the word "determine," insisting that an investigation or inspection must occur for the sole purpose of ascertaining whether a dealer has violated the relevant standards.  See ASPCA MSJ, ECF No. 51, at 26–27.  ASPCA's approach effectively changes the statute to read:  APHIS "shall make such investigations or inspections . . . [*only*] to determine" whether there has been a violation.  But the text of the statute is not so restrictive.  Even if it were, the AWA does not define "investigation" or "inspection," so it is not self-evident that every *visit* to a regulated dealer must entail a determination as to the dealer's compliance with statutory standards.  To the extent ASPCA suggests otherwise, it is mistaken.

ASPCA next argues that the Courtesy Visits Rule is contrary to law because the AWA does not affirmatively authorize education or voluntary compliance programs "as substitutes (or even complements) to enforcement[.]"  ASPCA MSJ, ECF No. 51, at 28.  To be sure, APHIS is not at liberty to entirely replace statutory enforcement with a voluntary compliance regime—but the Courtesy Visits Rule represents no such wholesale abdication of APHIS's enforcement obligations.  The Court will explore the precise interaction between the Courtesy Visits Rule and the agency's inspection regime later in this Opinion.  See infra Section III.B.1.a.ii.2.

For now, it is enough to reiterate that the AWA authorizes APHIS to "promulgate such rules, regulations, and orders" as "necessary" to "effectuate" the Act's purposes, 7 U.S.C. § 2151, one of which is to ensure that regulated parties are complying with minimum animal welfare standards, id. § 2143(a)(2).  "Where Congress has delegated general authority to carry out an enabling statute, an agency's exercise of that authority ordinarily must be reasonably related to the purpose of the legislation."  Wash. All. of Tech. Workers v. DHS, 50 F.4th 164, 179 (D.C. Cir. 2022) (quoting Doe, 1. v. FEC, 920 F.3d 866, 871 (D.C. Cir. 2019)) (cleaned up).  Here, APHIS's efforts to educate dealers about their regulatory obligations as a way to increase

22

compliance is reasonably related to a core purpose of the AWA. So, although APHIS may not

operate "[i]n the absence of statutory authorization for its act," Hikvision USA, Inc. v. FCC, 97

F.4th 938, 944 (D.C. Cir. 2024) (citations omitted), the general conferral of authority on APHIS

means that the Act "need not specifically authorize each and every action taken by [the agency],

so long as [its] action is reasonably related to the duties imposed upon [it]," Wash. All. Tech.

Workers, 50 F.4th at 179 (second and third alterations in original) (quoting Narenji v. Civiletti,

617 F.2d 745, 747 (D.C. Cir. 1979)).[6]

*ii. Section 756 of the Consolidated Appropriations Act of 2023*

Following the hearing on the summary judgment motions, the Court ordered

supplemental briefing on the impact of Section 756 of the 2023 Consolidated Appropriations Act

on the lawfulness of the Courtesy Visits Rule. As a refresher, Section 756 prohibits APHIS from

spending funds on "any activities related to the permitting of non-recording of observed

violations of the Animal Welfare Act or its regulations on official inspection reports." Among

other issues, the Court asked the parties to weigh in on (a) whether the Courtesy Visits Rule

violates Section 756; and (b) "[w]hether ASPCA forfeited this potential contrary-to-law

argument by failing to raise it in its motion for summary judgment[.]" Min. Order Apr. 18, 2025.

The Court first addresses forfeiture and then considers the merits of this additional contrary-to-

law argument.

_____

[6] For its part, ASPCA seems to agree with the generic proposition that agencies routinely have authority to carry out educational initiatives aimed at increasing regulatory compliance, even when their enabling statutes do not expressly say so. See MSJ Hearing Tr. at 17:17–25 (The Court: "[A]gencies educate their constituencies all the time about what the regs mean and how they're going to be applied. How is going out to a dealer and explaining that in person in the form of a courtesy visit any different than standard education that most agencies do?" ASPCA: "Well, I think you're right, Your Honor. There are many educational efforts by agencies such as websites that we would not—no one would be challenging . . .").

1.  Forfeiture

The twin principles of forfeiture and party presentation are key to our adversarial system
of adjudication.  These principles ensure that parties "are responsible for advancing the facts and
argument entitling them to relief[,]" United States v. Sineneng-Smith, 590 U.S. 371, 375–76
(2020) (quoting Castro v. United States, 540 U.S. 375, 386 (2003) (Scalia, J., concurring)), and
that parties do not unjustifiably tack on new legal arguments in the later stages of a dispute, see,
e.g., United States v. Godines, 433 F.3d 68, 70 (D.C. Cir. 2006) ("Ordinarily, an issue raised for
first time at oral argument is 'waived because it was not raised in [the] briefs.'" (alteration in
original) (quoting Ark Las Vegas Rest. Corp. v. NLRB, 334 F.3d 99, 108 n.4 (D.C. Cir. 2003)));
Sinha v. Blinken, No. 20-cv-2814, 2021 WL 4476749, at *3 (D.D.C. Sep. 30, 2021) ("It is well
settled that a party cannot amend [its] complaint through motions briefing.").  In other words,
these principles help the litigants avoid (1) unfair surprise and (2) judicial overreach.  Cf. Hormel
v. Helvering, 312 U.S. 552, 556 (1941); Sineneng-Smith, 590 U.S. at 376 (explaining that courts
should not "sally forth each day looking for wrongs to right" (quoting United States v. Samuels,
808 F.2d 1298, 1301 (8th Cir. 1987) (Arnold, J., concurring))).

This case presents a unique circumstance where the belated presentation of an argument
does not generate concerns of unfair surprise and judicial overreach.  Because the Court ordered
supplemental briefing, the government "has had a full opportunity to respond to the plaintiffs'
argument" and has done so.  Tanner-Brown, 105 F.4th at 444; see also Wash. Post Co. v. Special
Inspector Gen. for Afghanistan Reconstruction, No. 18-cv-2622, 2021 WL 4502106, at *20
(D.D.C. Sep. 30, 2021).  Nor is this a case of the Court reaching out in search of new claims.
Although ASPCA did not squarely raise a contrary-to-law claim under Section 756 in its
summary judgment motion, its early briefing rendered the issue apparent and unavoidable.

ASPCA first quoted the provision in the "Statement of the Case" section of its motion, under the heading "[Office of Inspector General] and Congress Condemn the Policy and Its Rationale." ASPCA MSJ, ECF No. 51, at 12–13. Later, in asserting that the challenged rules are arbitrary and capricious, ASPCA again emphasized that they contravene Congress's expressed will— referencing, *inter alia*, Section 756. See id. at 42–43. Finally, in its reply brief, ASPCA once more referenced Section 756 in arguing that Congress has directed APHIS to record all observed violations. See ASPCA MSJ Reply Br., ECF No. 58, at 33 (citing ASPCA MSJ, ECF No. 51, at 10–13). ASPCA's briefing thus conveyed, albeit not directly, that Section 756 undercuts the legality of the Courtesy Visits Rule. The Court will not ignore what has been placed in front of it, especially now that both parties have had a full opportunity to brief the statute's relevance to this case.

APHIS cites several decisions to persuade the Court that ASPCA has forfeited its Section 756 argument. But the circumstances at play in those cases are materially distinct from those here. In Gov't of Manitoba v. Bernhardt, for instance, the plaintiff attempted to assert a standing argument on appeal that it had mentioned only once in its complaint and provided no support for in the district court. 923 F.3d 173, 179 (D.C. Cir. 2019). Here, by contrast, the facial support for ASPCA's contrary-to-law claim is apparent in the briefing. (Not to mention, of course, that this case is not on appeal.) Similarly, in Talbot v. Dep't of State, this Court rejected an argument that went completely unmentioned in the briefing and was raised for the first time at oral argument. 315 F. Supp. 3d 355, 371 n.4 (D.D.C. 2018) (Cooper, J.). Next, in Citizens for Resp. & Ethics in Wash. v. Trump, this Court held, on a motion to reconsider, that the plaintiff had forfeited arguments by not raising them in its opposition to the government's motion to dismiss. No. 17-cv-1228, 2018 WL 8187206, at *1–2 (D.D.C. June 25, 2018) (Cooper, J.). Those contentions

had gone so clearly without mention in the briefing that the court did not acknowledge them or any forfeiture issue at all in the original opinion. See Citizens for Resp. & Ethics in Wash. v. Trump, 302 F. Supp. 3d 127 (D.D.C. 2018) (Cooper, J.). And finally, the government cites Maalouf v. Islamic Republic of Iran, wherein the D.C. Circuit held that courts cannot assert affirmative defenses on behalf of absent litigants. 923 F.3d 1095, 1112 (D.C. Cir. 2019). Of course, ASPCA is present here, and the Court is not fashioning the organization's argument out of whole cloth—it is confronting a point that was raised, albeit obliquely, in ASPCA's original briefing. Ultimately, the government does not point to any case where an issue was fully briefed at the summary judgment stage and the court nevertheless held that it was forfeited.

"Federal courts are entitled to apply the right body of law" even if the parties do not always perfectly "name" it. Smith v. Mallick, 514 F.3d 48, 51 (D.C. Cir. 2008) (citing Mwani v. bin Laden, 417 F.3d 1, 11 n.10 (D.C. Cir. 2005)). Here, the "right body of law" was identified to the Court before supplemental briefing, and the parties have since submitted two briefs each on this additional question. Accordingly, the Court will consider whether the Courtesy Visits Rule violates Section 756.

## 2.  Analysis

The Courtesy Visits Rule runs afoul of Section 756 of the Appropriations Act because it permits inspectors not to record observed violations of the AWA and its regulations while on courtesy visits. The Court reaches this conclusion by considering the text of Section 756, as well as its legislative history and the specific details of APHIS's courtesy visits regime.

"As always," the Court "start[s] with the text." Campos-Chaves v. Garland, 602 U.S. 447, 457 (2024) (citation omitted). Again, the full text of Section 756 reads:

> Hereafter, none of the funds made available by this Act or any other Act, may be used to pay the salaries or expenses of personnel to implement any activities related

to the permitting of non-recording of observed violations of the Animal Welfare
Act or its regulations on official inspection reports.

Consolidated Appropriations Act of 2023, supra, § 756.  On a preliminary note, "[t]he parties

agree that" Congress's use of the term "[h]ereafter" signifies that Section 756 was meant to

"effect[] a permanent change in law[,]" even though it was included in an annual appropriations

act.  APHIS Supp. Memo., ECF No. 71, at 2; see also ASPCA Supp. Memo., ECF No. 70, at 8.

As to substance, the provision—though far from a model of legislative clarity—has a discernible

meaning:  APHIS may not use appropriated funds to support the non-recording of observed

violations of the AWA or its regulations during "any" activity "related to" inspections.

APHIS reads Section 756 differently, insisting that the provision only prohibits the non-

recording of observed violations during an ongoing official inspection because "it is only during

[an] inspection[]" that an "official inspection report" is created.  APHIS Supp. Memo., ECF No.

71, at 6.  To be sure, the phrase "on official inspection reports" is limiting.  It suggests that *some*

connection to inspections is required for an activity to fall within the scope of Section 756.  But

APHIS's bright-line restriction is an otherwise unnatural reading of the provision.  The language

contains no prerequisite that an inspection report already be open, just a firm instruction that

observed violations shall be recorded "on" inspection reports.  If Congress intended the provision

to target violations observed only during an official inspection that has already begun, it could

have said so directly.  See Bittner v. United States, 598 U.S. 85, 98 (2023) (taking the fact that

Congress did not do "the simplest thing" to achieve an objective as evidence that Congress did

not seek that objective).  The Court will not read such a hard limit into Section 756 where none

exists.[7]

_____

[7]  APHIS contends that if the phrase does not limit Section 756 to inspections, it becomes
surplusage.  APHIS Supp. Memo., ECF No. 71, at 8.  That is incorrect.  Not only does "on
official inspection reports" create some required linkage to inspections, but it allows Congress to

In addition, APHIS's interpretation ignores more sweeping language elsewhere in the provision. It rewrites the statute to forbid only the "non-recording of observed violations" on official inspections. Congress instead enacted a much broader prohibition, on "*any activities related to the permitting of* non-recording of observed violations[.]" Consolidated Appropriations Act of 2023, supra, § 756 (emphasis added). Again, the AWA does not define "investigation" or "inspection," and it is far from clear that every agency visit to a dealer constitutes one or the other. However, for several reasons, the courtesy visits at issue here are sufficiently intertwined with official inspections as to constitute an "activit[y] related to" them.

*First*, as the agency has made clear, courtesy visits were intended to address the problem of unsuccessful inspection attempts. See, e.g., APHIS MSJ, ECF No. 54, at 6–8, 45–49; APHIS MSJ Reply Br., ECF No. 62, at 8 ("[T]he entire purpose of conducting courtesy visits is to reduce the amount of time and resources lost to conducting repeated attempted inspections[.]"); MSJ Hearing Tr. at 36:17–20 ("Courtesy visits, as is well established in the record, were created to solve the problem of agency inspectors not being able to get inside facilities and actually inspect the animals . . ."). Several years ago, APHIS considered instituting announced inspections in lieu of its longstanding practice of unannounced inspections, as a pilot study suggested that "announced inspections" would "lower[] the rate of attempted inspections at facilities with limited access." C.A.R. 5062. The agency ultimately decided against doing so because "the use of unannounced inspections" afforded the inspection program a "high level of credibility in the eyes of the public[,]" and "animal interest groups and other members of the public would likely express strong concern" about an inspection regime where regulated parties

---

take advantage of the existing statutory framework requiring APHIS to publish violations. See 7 U.S.C. § 2146a(b)(1). Otherwise, Congress would either risk violations being recorded but not published, or have to design an entirely new (and potentially flawed) procedure for publication.

had advance notice of evaluation.  C.A.R. 5253.  Instead, APHIS opted to develop its courtesy visits program, which gave inspectors "the opportunity to realize the benefits attained with the educational processes tested under the pilots while avoiding the concerns caused by utilizing announced inspections."  C.A.R. 5254.  In this litigation, APHIS insists that courtesy visits "conserve[] the agency's limited resources otherwise lost to repeated attempted inspections (and thus allows those resources to be devoted to inspections that will actually occur)[.]"  APHIS MSJ Reply Br., ECF No. 62, at 22.

*Second*, this history demonstrates that courtesy visits provide an opportunity at redemption of sorts for dealers who have not complied with their threshold statutory obligation to make facilities available for federal inspection.  According to the Guide, an inspector must offer a courtesy visit if she is unable to access the facility after multiple attempts at unannounced inspection.  C.A.R. 8815–16, 9554–55.  The idea is to allow APHIS to "check on the welfare of the animals at facilities where access has been limited" without punitive consequences, to "explain to facilities the importance of conducting inspections," and to work with the licensee/registrant "to identify reasons for attempted inspections" and avoid unsuccessful inspection attempts in the future.  C.A.R. 9554.  If a courtesy visit follows on a series of failed inspection attempts, the APHIS inspector must attempt another routine, unannounced inspection within two months of the visit.  C.A.R. 8816, 9556.  So although APHIS repeatedly insists that courtesy visits do not occur "in lieu" of inspections, the timing of the visits is hardly random; it is linked to failed inspection attempts.

*Third*, APHIS's recent adjustments to the rule further evince that the courtesy visits program and inspection regime are interwoven.  It used to be that inspectors who made courtesy visits could not record any non-compliances they observed on-site.  In 2024, "[i]n light of th[e]

congressional direction" reflected in Section 756, the agency "reevaluated" the courtesy visit program and decided to "updat[e]" its parameters to "close a perceived gap in making all noncompliances observed publicly available." C.A.R. 9087. Now, if an inspector observes a Direct NCI during a courtesy visit, the visit "is converted to a focused inspection" on a dime.[8] C.A.R. 9461; see also C.A.R. 9571–72. The agency further clarified in its 2025 update to the Guide that when a courtesy visit morphs into an inspection, the inspector "must cite" *all* "additional noncompliances observed during the focused inspection" in order to conform with Section 756. C.A.R. 9461. And if an inspector observes a Direct NCI during a courtesy visit, that visit-turned-inspection has a direct impact on the schedule of subsequent inspections. APHIS MSJ Reply Br., ECF No. 62, at 19.

All this is to say that courtesy visits are not just "related to" inspections, but closely intertwined in purpose and design—not to mention carried out by the same personnel in similar ways. Cf. C.A.R. 9843 (courtesy visit training presentation materials explaining that inspectors conducting visits at unlicensed facilities should "offer to walk through the facilities and animal areas and review records *as [they] would during a routine inspection*" (emphasis added)); APHIS MSJ Reply Br., ECF No. 62, at 17 (describing the courtesy visits program as "a complement" to the inspection program that is "designed to effectuate the effectiveness of inspections"). Thus, because the Courtesy Visits Rule permits—in fact, directs—inspectors to

---

[8] The agency's interpretation of Section 756 as warranting the documentation of non-compliances *only* after a Direct NCI is observed has no basis in the text of the AWA or the appropriations statute. Neither statute differentiates between types of non-compliances in such a fine-grained fashion. If anything, the AWA conveys that inspectors are not just to monitor for current, serious regulatory violations, but also past and even minor ones. See 7 U.S.C. § 2146(a) ("The Secretary shall make such investigations or inspections as he deems necessary to determine whether any dealer . . . *has violated or is violating any provision* of this chapter or any regulation or standard issued thereunder . . ." (emphasis added)).

ignore instances of non-compliance unless and until they notice a Direct NCI, the rule cannot be squared with Section 756's text.

The Court's reading of Section 756 is further bolstered by its legislative history. The House Committee Report accompanying the 2023 Consolidated Appropriations Act emphasized that "[t]he Committee is concerned about APHIS's Animal Care program and the steep decline in enforcement related to violations of the Animal Welfare Act." H.R. Rep. No. 117–392, at 33 (2022). As such, the Committee "direct[ed] the agency" to, *inter alia*, "act swiftly when facilities fail to comply with any of the Act's requirements"; "ensure each interference with, and/or failure to allow access for inspection, as well as each violation or failure to comply with animal welfare standards, is documented on an inspection report"; and "ensure that there is no use of teachable moments or any similar program that obscures findings during inspections[.]" Id. Earlier years' reports contain similar expressions of concern. See H.R. Rep. No. 117–82, at 35–36 (2021) (same language); H.R. Rep. No. 116–446, at 35 (2020) ("[T]he Committee directs Animal Care to ensure that each noncompliance observed by a USDA inspector under the Animal Welfare Act, is documented on an inspection report."); H.R. Rep. No. 116–107, at 28–29 (2019) ("[T]he Committee directs Animal Care to immediately require all its inspectors to cite every observed violation *at any visit to a regulated entity*." (emphasis added)). Taken together, these reports reflect growing congressional frustration with APHIS's non-recording of violations, both during and adjacent to official inspections. The legislative history thus supports the Court's parsing of the statutory text.

In the alternative, APHIS asserts that ASPCA's challenge to the Courtesy Visits Rule fails because it has brought a facial challenge and has not shown that there is "no set of circumstances" under which the rule is valid. APHIS Supp. Reply Br., ECF No. 74, at 9–10; see

also <u>Reno v. Flores</u>, 507 U.S. 292, 301 (1993) ("To prevail in such a facial challenge, respondents 'must establish that no set of circumstances exists under which the [regulation] would be valid.'  That is true as to . . . the statutory challenge." (alteration in original) (citations omitted)); <u>Sherley v. Sebelius</u>, 644 F.3d 388, 397 (D.C. Cir. 2011).  To substantiate this point, APHIS describes a scenario where "an inspector conducting a courtesy visit observes no violations[.]"  APHIS Supp. Reply Br., ECF No. 74, at 9.  It contends that this situation "could not" contravene Section 756; therefore, in APHIS's view, there is a "set of circumstances" where courtesy visits are valid under the statute, which dooms ASPCA's facial challenge.  <u>See id.</u> at 9–10.  But APHIS is barking up the wrong tree, as this scenario would still conflict with Section 756.  When an inspector sets out for a courtesy visit, she does not know whether she will observe a violation.  What she does know, however, is that she is *permitted*—indeed, instructed—not to record most non-compliances she sees.  Even before entering the regulated facility, then, the inspector is already being paid to engage in conduct that is squarely prohibited by Section 756.

Finally, APHIS worries that ASPCA's reading of Section 756 would lead to "absurd result[s]," such as having to record "public complaints . . . that include videos, photos, and detailed letters" on inspection reports.  <u>See</u> APHIS Supp. Reply Br., ECF No. 74, at 10–11.  Its concern is misplaced.  As explained above, Section 756 is not unlimited:  It covers "violations" that are "observed" during "activities related to" inspections.  <u>See</u> Consolidated Appropriations Act of 2023, <u>supra</u>, § 756.  A public complaint about animal abuse does not fall within Section 756's scope because (a) the conditions detailed in the complaint would not have been directly "observed" by APHIS personnel (and upon further consideration by the agency, may not even reflect a genuine statutory violation), and (b) the agency's passive receipt of information from

the public is not an "activit[y] related to" inspection (unless it were to warrant an inspection in the agency's estimation).

The text and history of Section 756, along with the details of the courtesy visits initiative, lead the Court to the conclusion that APHIS inspectors must record all observed regulatory violations while on courtesy visits.  Despite their legitimate educational justification, courtesy visits are "related to" the inspection regime.  Because the Courtesy Visits Rule allows the non-recording of some observed statutory or regulatory violations, it runs afoul of Congress's direction in Section 756 and is therefore contrary to law.

### b.  Arbitrary and Capricious

"Agency action is arbitrary and capricious if [the agency] 'has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'"  Sinclair Wyoming Refin. Co. LLC v. EPA, 114 F.4th 693, 711 (D.C. Cir. 2024) (quoting Motor Vehicle Mfrs. Ass'n of U.S., Inc., 463 U.S. at 43).  "Under this standard, an agency must engage in reasoned decision making."  Id.  But "the scope of review . . . is narrow," and the Court is not to "substitute its own judgment for that of the agency."  Ameren Ill. Co. v. FERC, 58 F.4th 501, 505 (D.C. Cir. 2023) (cleaned up).  Ultimately, the APA "requires that agency action be reasonable and reasonably explained."  FCC v. Prometheus Radio Project, 592 U.S. 414, 423 (2021).

APHIS's courtesy visits program may be a perfectly sensible way to promote compliance through education and conserve scarce resources through the avoidance of failed inspection attempts.  But in light of Section 756, the current Courtesy Visits Rule is neither reasonable nor

reasonably explained. Although APHIS marshals evidentiary support for the development of the courtesy visits program as a whole, the agency offers no principled justification as to why the observation of a Direct NCI should convert a courtesy visit into a focused inspection—itself a limited inspection that "covers only a particular area of concern," C.A.R. 9087—whereas the observation of any number of other violations go un-recorded and trigger no follow-up. Agency leadership primarily justified the tweaks to the rule based on the congressional directive enshrined in Section 756. See C.A.R. 9087, 9825; see also APHIS MSJ, ECF No. 54, at 53. But Section 756 makes no distinction between types of non-compliance; an observed violation is an observed violation.

Consider, for instance, a courtesy visit during which an inspector becomes aware of a Critical NCI—she can tell, say, that the "[a]ctions or inactions of unqualified personnel" have resulted in past "adverse effects on the health or well-being" of a dog or that the "handling" of a dog resulted in an attack on a member of the public. C.A.R. 9480. Such a non-compliance may be just as severe as a Direct NCI, but because it is not "current," the Courtesy Visits Rule prohibits its documentation. C.A.R. 9481.

This differential treatment finds no support in Section 756—or, for that matter, anywhere else in the record. In a decisional memorandum accompanying the 2024 adjustment to the rule, the agency suggested that non-Direct NCIs should not be cited because they "may . . . make licensees and registrants less likely to take advantage" of courtesy visits, which in turn may reduce AWA compliance. C.A.R. 9088. That could well be true. But even if it were, APHIS does not explain how to square this delicate balancing exercise with the blunt terms of Section 756; the agency only tried to thread that needle once it was haled into court by ASPCA. In short, the revised Courtesy Visits Rule is a half-measure when judged against the yardstick Congress

created.  And it is unreasonable for APHIS to cherry-pick those aspects of a congressional directive that suit the agency policy-wise and ignore its other implications.

In sum, aside from the Courtesy Visits Rule being contrary to Section 756, it is also—in its current form—arbitrary and capricious.

### 2. Veterinary Care Rule

#### a. Contrary to Law

The Court turns next to the Veterinary Care Rule, which it finds consistent with the AWA and its regulations.  To explain why, two preliminary observations are in order.

*First*, the veterinary care standards serve to ensure that each regulated dealer has adopted an adequate program of medical care—not to guarantee that all animals are healthy at all times. Specifically, dealers must demonstrate that they are using "appropriate methods to prevent, control, diagnose, and treat diseases and injuries," 9 C.F.R. § 2.40(b)(2), including the provision of "emergency, weekend, and holiday care"; the "[d]aily observation of all animals"; regularly scheduled visits and physician examinations carried out by attending veterinarians; and preventive care and treatment, 9 C.F.R. §§ 2.40(b)(2)–(3), 3.13(a)(1)–(4).  In other words, the veterinary care regulations focus principally on the dealer's *response* to animal health issues that arise or may arise in the future.[9]

---

[9] As the agency emphasizes, if animals are observed to be in "pain or distress" despite having received adequate care, that suffering may very well give rise to "other noncompliances with AWA standards of care, but not necessarily a veterinary care noncompliance."  APHIS MSJ Reply Br., ECF No. 62, at 21 n.2.  More specifically, health issues that arise due to improper "handling, housing, feeding, watering, sanitation, ventilation, shelter," or lack of exercise may result in a non-compliance under one of the many other welfare standards that inspectors enforce.  7 U.S.C. § 2143(a)(2)(A)–(B); see generally 9 C.F.R. Subch. A, Pt. 3 (establishing an array of operating, health, husbandry, and transportation standards for several different kinds of animals).

*Second*, unlike the Courtesy Visits Rule, the Veterinary Care Rule does not prevent APHIS inspectors from recording observed violations of the Act and its implementing regulations.  The rule is instead intended to help inspectors determine what qualifies as a violation in the first place.  As such, the rule serves as a rubric for inspectors to use, rather than a stringent directive to inspectors to ignore certain *bona fide* violations.[10]

True, the Veterinary Care Rule delineates when a facility "is" or "is not" in compliance with the pertinent standards.  And internal training materials instruct inspectors to use the rule— more specifically, a flowchart that summarizes the Rule's criteria in graphic form—to assess "*all* veterinary care issues at *all* facilities."  C.A.R. 5991 (emphasis in original); see also C.A.R. 5832 ("Always Follow the Flow Chart!!"), 5970.  Presumably, inspectors may not ignore or decline to apply the rubric set forth in the rule.

At the same time, various disclaimers demonstrate that the application of the Veterinary Care Rule is not entirely rigid.  For example, the introductory paragraph immediately preceding the rule states that the "information in [the veterinary care] section is provided for [inspectors'] guidance but all citations must be based on the Regulations and Standards."  C.A.R. 9660; see also MSJ Hearing Tr. at 41:25–42:5 ("[T]he very first sections in this guide make clear that it in no way is designed or can override the underlying regulations . . . [T]he guide also makes very clear that each inspector retains the discretion to determine whether there is an AWA violation.").  Throughout the veterinary care section of the Guide, inspectors are advised to contact other APHIS personnel or the attending veterinarian if they are unsure about the adequacy of a dealer's treatment protocol in any particular situation.  See, e.g., C.A.R. 9660,

---

[10]  Because the Veterinary Care Rule does not, by its terms, prevent inspectors from recording observed violations, the Court's contrary-to-law review does not implicate Section 756.

9664, 9667; see also C.A.R. 5932 ("When should the [attending veterinarian] be contacted?").
And APHIS's briefing aptly describes the rule as "clarifying" situations that "*may [or] may not*
constitute a violation*" of the relevant standards.  APHIS MSJ Reply Br., ECF No. 62, at 14
(emphasis added).  Whereas the Courtesy Visits Rule tells inspectors to disregard certain
violations they observe while on a site visit, the Veterinary Care Rule cannot be fairly read to
"supersede" the statute, regulations, or even "the inspector's professional judgment."  C.A.R.
9502.

      With these points in mind, the Court considers whether the challenged components of the
Veterinary Care Rule run afoul of the statutory or regulatory texts.  To begin: where an inspector
observes minor veterinary issues that have "little or no discernible impact on an animal's overall
health," are limited to a small number of animals, and can be "rapidly addressed," the rule
clarifies that the AWA's veterinary care standard is not violated because "the facility has
demonstrated it has an ongoing program that provides adequate care to animals and is, therefore,
in compliance."  C.A.R. 9660–61.  Consider the following example from APHIS's inspector
training materials.  In a kennel of fifty dogs, an inspector observes that two female Yorkies have
long coats with matted hair.  C.A.R. 6530.  The dealer explains that the two dogs just had
puppies, and he was waiting until they were a few weeks old before he "pull[ed] the moms" for
grooming "since it's important to keep mom with the pups."  Id.  The dealer "assures" the
inspector "he can get [the grooming] done this week."  Id.  According to the Veterinary Care
Rule, the dealer is in compliance with the relevant veterinary care regulation.  Id.  The Court fails
to see how such a finding would be inconsistent with the governing statutory and regulatory
provisions.

When an inspector observes one or more animals with serious veterinary issues, or more than a small number of animals with minor conditions, she may still find that the facility is in compliance if the dealer has identified the issue; is following a duly-authorized treatment plan; and either the animal is responding to the treatment or the dealer has re-contacted the attending veterinarian and is following instructions.  C.A.R. 9661.  Under these circumstances, the dealer would again adhere to its veterinary care obligation by identifying the medical issue(s) and following a clinically-directed treatment plan in an effort to resolve them.  Take another example from APHIS's training materials.  An inspector notices, during her routine spot check, that a dog has at least one infected tooth on each side of his mouth.  C.A.R. 6607.  The licensee explains that he noticed this pooch and a few others that required dental care and states that he is slated to bring them to the veterinarian this month.  Id.  The inspector calls the vet, who confirms that the licensee has scheduled the dogs for dental care this month.  Id.  The veterinarian "doesn't recommend any interim care before the office visit" because the pup in question "is eating well." Id.  The rule authorizes the inspector to find the dealer compliant based on his adherence to the specified course of care.  Once again, the Court struggles to see how a dealer who readily identifies a veterinary care issue and acts according to his veterinarian's direction runs afoul of the AWA and its regulations.

Finally, the Veterinary Care Rule states that the facility is in compliance with the relevant regulatory standards if the medical issue "occurred" after the "last daily observation on that day," or "could not have been observed by the facility" and the facility has not had a veterinary care citation within the last three years.  C.A.R. 9661.  Again, such a finding under these circumstances does not obviously contravene the AWA:  If a medical issue arises after the dealer's daily rounds, or if the facility could not have observed the issue, the dealer would

presumably not yet have had a chance to respond to the problem according to its veterinary plan or at the attending vet's direction.

Before closing, the Court meditates briefly on the inherent flexibility of the Veterinary Care Rule. Consider one last example, this time pulled from ASPCA's briefing. Say that an inspector observes "multiple dogs with infected nails, rotting teeth, irritated eyes," and other such localized injuries, and the dogs are "thus in extreme discomfort." ASPCA MSJ Reply Br., ECF No. 58, at 23–24. For a number of reasons, an inspector would not—as ASPCA suggests—be "forbidden from documenting this in an inspection report so long as the dealer represented that [he] would 'rapidly address[]' the issues[.]" Id. (second alteration in original). First, the Guide does not define a dog with "infected nails, rotting teeth, [and] irritated eyes" as "minorly" injured; an inspector would be well within the bounds of her duty to describe the accumulation of such ailments as "major" injuries. Second, an animal in "extreme discomfort" due to multiple ailments is not experiencing the kind of minor veterinary setback that has "little to no discernible impact on an animal's overall health" and therefore could be "rapidly addressed" per the rule. Third, even if such injuries were thought to be "minor," once an inspector sees that the issue is widespread, she must reassure herself that the dealer is responding according to a program of care authorized by the attending veterinarian. Finally, and perhaps most importantly, the language of the rule does not flatly forbid the inspector to do what would otherwise be demanded by APHIS's "Regulations and Standards." For instance, if the inspector were to deduce that widespread nail, teeth, and eye issues resulted from a dealer's inadequate program of *preventative* care, the Court does not read the Veterinary Care Rule to prohibit her from citing the dealer for a violation of 9 C.F.R. § 3.13(a)(4), which requires that dogs receive "[p]reventative care and treatment to ensure . . . properly trimmed nails, and clean and health

eyes, ears, skin, and teeth." The Court also notes that, under such a circumstance, the facility would likely not be "in compliance" with the AWA even under the text of the Veterinary Care Rule, as it has not timely "identified" the *underlying* "veterinary care issue"—i.e., a lack of preventative medical care. C.A.R. 9661.

Having examined each of its subcomponents, the Court concludes that the Veterinary Care Rule does not run contrary to the AWA or its implementing regulations. Bolstering this conclusion is the Guide's reassurance that the inspector's citations must ultimately "be based on the Regulations and Standards," not the Guide's instructions. As a result, an inspector has the latitude to record an evident violation of the governing standards of care.

b. <u>Arbitrary and Capricious</u>

Finally, the Court evaluates whether the Veterinary Care Rule is arbitrary and capricious—a question which the parties' briefing gives relatively short shrift. <u>See, e.g.</u>, ASPCA MSJ Reply Br., ECF No. 58, at 32 (addressing rationality of Veterinary Care Rule in one paragraph); APHIS MSJ Reply Br., ECF No. 62, at 24–25 (addressing rationality of Veterinary Care Rule in three paragraphs).

As compared to the volume of documentation in the record on the motivation behind the courtesy visits program, there is limited evidence as to why the Veterinary Care Rule was adopted. But based on email correspondence from a top APHIS official to agency staff and contemporaneous inspector training materials, the Court can discern several motivations for the 2018 revision to the veterinary care section of the Guide: (1) to increase in the "consistency" of the "inspection process" by "mak[ing] it easier for [inspectors] to be sure [they] are following the correct guidance[,]" C.A.R. 6094; (2) "[t]o improve the relationship between the licensee/registrant and the Attending Veterinarian, [a]nd the relationship between [APHIS] and

the Attending Veterinarian[,]" C.A.R. 5574; and (3) "[t]o ensure [the agency's] application of [9 C.F.R. §§] 2.33 and 2.40 are backed by the regulations and not over-reaching[,]" C.A.R. 5574, 5925.[11]

APHIS has acted within a "zone of reasonableness" here, and exercising due deference, the Court concludes that the agency has "reasonably explained" its decision to adopt the Veterinary Care Rule.  Prometheus Radio Project, 592 U.S. at 423.  For starters, it is entirely reasonable that including illustrative examples in the Guide would help standardize the inspection process, which otherwise enables each inspector to make individualized decisions. Cf. C.A.R. 9467 ("The Inspection Guide is designed to facilitate the decision-making process. It cannot, and is not intended to, replace the inspector's professional judgment.").  At least one version of the Guide that predates the Veterinary Care Rule had a similar kind of "Question[] and Answer[]" section designed to help inspectors respond to particular scenarios they may encounter in the field.  See C.A.R. 426–28.  The Veterinary Care Rule serves a similar purpose, as evinced by agency training materials in the record, including a decision tree that depicts the rules in digestible format and urges inspectors to "Always Follow the Flow Chart!!"  See, e.g., C.A.R. 5832.  These decisional tools encourage inspectors to respond to similar situations in similar fashion (even if, as noted above, they have some in-built flexibility).

Next, the Veterinary Care Rule plausibly encourages a relationship between regulated parties and their attending veterinarians, as well as between attending veterinarians and APHIS inspectors.  The rule prompts dealers to design clear, effective programs of care and to contact

---

[11] APHIS also contends that the Veterinary Care Rule helps the regulated community and the public understand APHIS's processes.  See APHIS MSJ, ECF No. 54, at 49; C.A.R. 6094. But at the summary judgment hearing, APHIS's counsel stated unequivocally that "the guide is not for the general public[,]" but rather for "inspectors."  MSJ Hearing Tr. at 37:20–21.  The Court will therefore not consider public transparency as one of the bases for the rule.

their veterinarians promptly after identifying veterinary care issues because if they do so, they are less likely to get dinged for non-compliance.  Furthermore, both the rule and the inspector training materials in the record underscore that APHIS inspectors should contact attending veterinarians when they are unsure whether a dealer is following clinical instructions or providing acceptable treatment, and the agency fairly views inspector-veterinarian communication as a boon for animal welfare.  See, e.g., C.A.R. 5789, 5924, 5932, 5970, 5991.

Finally, the Veterinary Care Rule conceivably helps the agency avoid over-reach.  As previously noted, the rule does not run contrary to the AWA or its implementing regulations, but instead trains inspectors' attention on inadequate *responses* to health issues that dealers have or should have identified.  The rule stresses that a dealer may be in regulatory compliance with the veterinary care standard, even if some animals are not well.  See, e.g., C.A.R. 6528, 6530.  In channeling the inspector's focus toward the dealer's plan of care, the rule hews closely to the governing veterinary care regulations.

To be sure, the agency might have better documented its apparent position that APHIS inspectors have, of late, issued an excessive number of veterinary care citations,[12] especially given other evidence in the record that the agency has previously received criticism for under-enforcement.  See, e.g., C.A.R. 4552 (1992 Office of Inspector General (OIG) report concluding that "APHIS did not inspect dealer facilities with a reliable frequency" and "did not enforce timely correction of violations found during inspections"); 4579 (1995 OIG report finding that

---

[12] At the summary judgment hearing, APHIS's counsel implied that there was evidence in the record that "some inspectors were writing down observed health conditions that on further review were determined not to be violations of the veterinary care regulations," which resulted in the need for "corrections" by "managers on review" and "generat[ed] an unnecessary number of appeals" by regulated parties.  MSJ Hearing Tr. at 40:10–41:3.  The government does not cite, and the Court has not found, such evidence in the administrative record.

"APHIS could make more effective use of its existing enforcement powers"); 4643 (2005 OIG report finding that APHIS "should improve its inspection and enforcement practices to ensure that animals receive humane care and treatment"); 4705 (2010 OIG report concluding that the agency's "enforcement process was ineffective against problematic dealers" and that "inspectors did not cite or document violations properly to support enforcement actions" (cleaned up)).  But it is far from clear that APHIS's prior enforcement problems stem from the Veterinary Care Rule.[13]  The agency might also have more thoroughly explained the origin and rationale behind the rule.  But a reviewing court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  Nat'l Ass'n of Home Builders, 551 U.S. at 658 (citation omitted).  As described, a few such paths are discernible here, and they are not much obscured by counter-evidence.

　　　　ASPCA raises two final points that merit consideration.  *First*, the organization contends that APHIS lacks evidence that its overall "Customer Service Policy," which includes the Courtesy Visits Rule and the Veterinary Care Rule, improves regulatory compliance.  See ASPCA MSJ, ECF No. 51, at 30–41.  It is true that the agency has defended the *Courtesy Visits Rule* on the basis that it improves compliance with the AWA's standards.  See APHIS MSJ, ECF No. 54, at 45.  But as just noted, the Veterinary Care Rule was justified on different grounds, including consistency in enforcement, relationship-building (which, in the agency's view, has a positive impact on animal welfare), and regulatory moderation.  Because all of these goals are within the agency's statutory purview, and the rule is a reasonable way of achieving them, the Court will "not substitute its own policy judgment for that of the agency[,]" Prometheus Radio

---

[13] A better explanation for these problems may be APHIS's decision not to impose statutory penalties and other concrete consequences on repeat offenders whom the agency knows to be violating the Act.  See ASPCA MSJ, ECF No. 51, at 13–16.

Project, 592 U.S. at 423, by second-guessing the agency's priorities or interrogating whether the rule is the *best* way of achieving them. Cf. Entergy Arkansas, LLC v. FERC, 109 F.4th 583, 594 (D.C. Cir. 2024) (explaining that, in the context of arbitrary-and-capricious review, an agency "is not required to choose the best solution, only a reasonable one" (quoting Petal Gas Storage, LLC v. FERC, 496 F.3d 695, 703 (D.C. Cir. 2007)).

*Second*, ASPCA argues that, in instituting both the Courtesy Visits Rule and Veterinary Care Rule, APHIS ignored sources that documented especially egregious animal abuse by certain dealers. To substantiate this point, ASPCA has attached materials to its summary judgment motion (including court filings and APHIS inspection reports) that catalogue tragic conditions at a handful of regulated facilities across the United States.

As a preliminary matter, the parties contest whether the Court may consider these materials, as they are outside the record. Compare ASPCA MSJ Reply Br., ECF No. 58, at 34–35, with APHIS MSJ Reply Br., ECF No. 61, at 25–26. In an APA case, the court's review is typically limited to the certified administrative record. See United Student Aid Funds, Inc. v. Devos, 237 F. Supp. 3d 1, 3–4 (D.D.C. 2017). The Court previously declined to order the agency to supplement the administrative record with ASPCA's proffered reports, but preserved the organization's opportunity to "establish that the agency acted arbitrarily and capriciously by not considering dog dealer inspection reports or specific enforcement actions reflected in APHIS's enforcement database." Mem. Op. & Order, ECF No. 39, at 8.

The Court elects to consider ASPCA's submissions for this narrow purpose, but concludes that the materials do not demonstrate that APHIS entirely failed to consider an important aspect of the problem that the Veterinary Care Rule was designed to fix. At best for ASPCA's argument, the reports suggest that some of the worst offenders took advantage of the

courtesy visits program and that APHIS may have been lax in pursuing meaningfully deterrent enforcement measures after inspectors documented an array of regulatory violations. But in its briefing, ASPCA only identifies one example where the Veterinary Care Rule, specifically, may have delayed the documentation of a veterinary care issue on an inspection report. ASPCA MSJ, ECF No. 51, at 35–41. And as troublesome as that example may be, it does not singlehandedly demonstrate that the agency missed a fundamental point in developing the rule, especially because, as the Court has already explained, inspectors have considerable latitude to determine whether a program of veterinary care is adequate. To the extent that what really gives rise to these outliers is a lapse in rigorous enforcement, see supra at 43 n.13, that is a separate issue that ASPCA does not challenge here. See MSJ Hearing Tr. at 16:9–10 ("To be clear, we're not challenging any particular nonenforcement.").

In contrast to the Courtesy Visits Rule, the Court is persuaded that the Veterinary Care Rule is "reasonable and reasonably explained." Prometheus Radio Project, 592 U.S. at 423. ASPCA's arbitrary-and-capricious challenge thus falls short.

## IV.   Conclusion

In light of this rather multilayered Opinion, the Court takes a moment to reiterate the precise boundaries of its ruling. The Veterinary Care Rule survives intact because it is neither contrary to law nor arbitrary and capricious. The Courtesy Visits Rule does not fare quite as well. While courtesy visits might further compliance through education and the avoidance of failed inspection attempts, Congress mandated, in Section 756 of the 2023 Consolidated Appropriations Act, that if an APHIS inspector observes a violation of the AWA or its regulations while conducting an activity "related to" inspections, she must record it on an official inspection report. Under the Courtesy Visits Rule, an APHIS inspector may visit a dealer for

45

educational purposes, but during that visit, she is barred from recording all but the most severe, ongoing regulatory non-compliances.  Because a courtesy visit is an activity "related to" inspections, and the rule permits the non-recording of many a non-compliance, the Courtesy Visits Rule is at odds with Section 756 and must be set aside.  Furthermore, the rule draws an arbitrary and capricious line between those observed violations that must be recorded and those that cannot be.

It is also worth reiterating that the "Courtesy Visits Rule" encompasses that part of the Guide which permits inspectors not to record all observed AWA violations while out on courtesy visits, and not the entirety of the courtesy visits program.  Even if dealers are hesitant to request or agree to courtesy visits once this part of the Guide is vacated, C.A.R. 9088, the Court notes that other tools—including discretionary elements of APHIS's enforcement regime, such as license suspensions and statutory penalties—remain at the agency's disposal to encourage dealer participation.  Low uptake is therefore not a foregone conclusion.

For the aforementioned reasons, the Court **GRANTS in part and DENIES in part** each side's motion for summary judgment.  A separate Order follows.

 

 

_____
CHRISTOPHER R. COOPER
United States District Judge

Date: <u>October 29, 2025</u>